## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

SONIA JENKINS, GERMAN PENA and )
BERNICE SMITH, )
on behalf of themselves and )   08 CV 2935
the classes defined herein, )
                              )   Judge Coar
            plaintiffs, )
                              )   Magistrate Judge Keys
        v. )
                              )
COUNTRYWIDE HOME LOANS, INC., )
 d/b/a AMERICA'S WHOLESALE LENDER, )
COUNTRYWIDE BANK, N.A., n/k/a, )
COUNTRYWIDE BANK, FSB; and )
COUNTRYWIDE FINANCIAL CORPORATION )
                              )   JURY DEMANDED
        defendants. )

## FIRST AMENDED COMPLAINT – CLASS ACTION

Plaintiffs Sonia Jenkins ("Ms. Jenkins"), German Pena ("Mr. Pena") and Bernice Smith

("Ms. Smith")(collectively, "plaintiffs") by their undersigned attorney, alleges as follows:

### INTRODUCTION

1.      This is an action brought by plaintiffs against Countrywide Home Loans, Inc.,

d/b/a America's Wholesale Lender; Countrywide Bank, N.A., n/k/a Countrywide Financial

Corporation; and Countrywide Financial Corporation (collectively "Countrywide"), under the

Equal Credit Opportunity Act, 15 U.S.C. § 1691, et seq. ("ECOA") and the Fair Housing Act, 42

U.S.C. § 3601 et seq.  Plaintiffs seek remedies for the discriminatory effects of Countrywide's

home financing policies and practices.

2.      As described below, Countrywide has established a specific, identifiable and uniform credit pricing system, a component of which, referred to herein as the Discretionary Pricing Policy (the "Policy"), authorizes unchecked, subjective surcharge of additional points and fees to an otherwise objective risk-based financing rate.  In other words, after a finance rate acceptable to Countrywide is determined by objective criteria (e.g., the individual's credit history, credit score, debt-to-income ratio and loan-to-value ratios), Countrywide's credit pricing policy authorizes additional discretionary finance charges.  These subjective, additional finance charges had a discriminatory impact on plaintiffs and the class members, in violation of ECOA and the FHA.

3.      Countrywide has established policies for retail and wholesale access to its loan products that subjected plaintiffs to a significantly higher likelihood of exposure to discretionary points, fees and interest mark-ups.  These costs drove up the cost of plaintiffs' mortgage loans.

4.      Plaintiffs seek damages, declaratory and injunctive relief, disgorgement and restitution of monies.

## JURISDICTION AND VENUE

5.      Plaintiffs invoke the jurisdiction of this Court pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court in a civil action arising under federal law.

6.      Venue is proper in this Court pursuant to 28 U.S.C. 1391(b) inasmuch as Countrywide regularly conducted and/or conducts business in this District, and all plaintiffs reside in this district.

## PARTIES

7.      Ms. Jenkins is an African-American homeowner who resides at 8640 S. Kenwood Avenue, Chicago, Illinois, 60619.

8.      Mr. Pena is a Latino homeowner who resides at 3815 N. Osceola Avenue, Chicago, Illinois, 60634.

9.      Bernice Smith is an African-American homeowner who resides at 4803 S. Forrestville Avenue, Chicago, Illinois, 60615.

10.     Defendant Countrywide Home Loans, Inc., doing business as America's Wholesale Lender ("Countrywide Home Loans"), is a residential mortgage lender with its principal place of business at 4500 Park Granada Blvd., Calabasas, California, 91302. Countrywide Home Loans does business in an extensive network of branches throughout the U.S., including in Illinois.  Its registered agent name and address are Prentice Hall Corporation, 33 North LaSalle Street, Chicago, IL 60602.

11.     Defendant Countrywide Bank, N.A., now known as Countrywide Bank, FSB ("Countrywide Bank"), is a federally insured savings bank with headquarters located at 1199 N. Fairfax Street, Suite 500, Alexandria, Virginia, 22313.  It is a residential mortgage lender that does business throughout the U.S., including in Illinois.  In addition to its bank branches, it originates mortgage loans through Countrywide Home Loans' network of retail branches, other Countrywide subsidiaries, outside mortgage brokers, correspondent lenders and other financial entities.

12.      Countrywide Home Loans and Countrywide Bank are subsidiaries of Countrywide Financial Corporation ("Countrywide Financial"), a diversified financial services

company.  Countrywide Financial has its principal place of business at 4500 Granada Park,

Calabasas, CA 91302.  It does business throughout the U.S., including in Illinois.

**FACTS**

A.     **MORTGAGE LENDING IN THE UNITED STATES HISTORICALLY HAS
        DISCRIMINATED AGAINST MINORITIES LIKE MS. PLAINTIFFS**

13.     According to a study by the Joint Center for Housing Studies at Harvard

University, mortgage lending discrimination today is subtle but pervasive, with minority

consumers continuing to have less-than-equal access to loans at the best price and on the best

terms that their credit history, income, and other individual financial considerations merit more

than three decades after the enactment of national fair lending legislation.  William C. Apgar &

Allegra Calder, *The Dual Mortgage Market:  The Persistence of Discrimination in Mortgage

Lending*, Joint Center for Housing Studies of Harvard University, December 2005, *available at*

www.jchs.harvard.edu/publications/finance/w05-11.pdf.

14.     The passage of civil rights legislation and fair lending laws in the 1960s and

1970s brought an end to the most virulent forms of overt racial discrimination in the housing

markets, but throughout the 1980s and 1990s, mortgage lenders found more subtle ways to

discriminate, including maintaining offices only in white neighborhoods and engaging in

practices such as redlining (refusing to lend on properties in predominantly minority

neighborhoods).

15.     After such redlining practices were challenged in the 1990s, mortgage lenders

changed tactics once again, making loans to minorities, but charging higher interest rates and

loan-related fees than they charged to similarly-situated white borrowers.  Loan data that

mortgage lenders must now compile and disclose under the federal Home Mortgage Disclosure

4

Act ("HMDA") reveals profound loan pricing disparities between minority borrowers and similarly-situated white borrowers.

16.    HMDA requires mortgage lenders to report information about the home loans they process each year.  In 2005, lenders reported information on more than 30 million home loan applications pursuant to HMDA.  In 1989, Congress required lenders to begin disclosing information about mortgage borrowers' race and ethnicity.  In 2004, concerned with potential racial discrimination in loan pricing and recognizing that racial or other types of discrimination can occur when loan officers and mortgage brokers have latitude in setting interest rates, the Federal Reserve Board began requiring lenders to also report information concerning rates, points, and fees, charged to borrowers on high-cost loans.

17.    According to the Federal Reserve, both 2004 and 2005 HMDA data revealed that "Blacks and minority borrowers were more likely . . . to have received higher-priced loans than non-minority whites. . . . [which has] increased concern about the fairness of the lending process."  Robert B. Avery, Kenneth P. Brevoort & Glenn B. Canner, *Higher-Priced Home Lending and the 2005 HMDA Data,* 2006 Federal Reserve Bulletin, A124, A159 (revised Sept. 18, 2006), *available at* http://www.federalreserve.gov/pubs/bulletin/2006/hmda/bull06hmda.pdf.

18.    HMDA data for 2004 reveals profound loan pricing disparities between minority borrowers and non-minority whites even after controlling for borrowers' gender, income, property location, and loan amount.  After accounting for those differences in the 2004 HMDA data, minority borrowers were still almost twice as likely to receive a higher-rate home loan as non-minority whites.  *Testimony of Keith Ernst before the Subcommittee on Financial Institutions and Consumer Credit*, June 13, 2006 at 3, *available at*

http://www.responsiblelending.org/pdfs/Testimony-Ernst061306.pdf.  In an October 2006

speech, the Vice-Chairman of the Federal Deposit Insurance Corporation, Martin Gruenberg,

noted that 2004 HMDA data "clearly indicated" that minority borrowers are more likely to

receive high-cost home loans than are non-minority whites.  Martin J. Gruenberg, FDIC Vice-

Chairman, Address to the Conference on Hispanic Immigration to the United States:  Banking

the Unbanked Initiatives in the U.S. (Oct. 18, 2006) *available at*

http://www.fdic.gov/news/news/speeches/archives/2006/chairman/spoct1806.html.

19.     Likewise, HMDA data for 2005 shows that "for conventional home-purchase

loans, the gross mean incidence of higher-priced lending was 54.7 percent for blacks and 17.2

percent for non-minority whites, a difference of 37.5 percentage points."  Avery et al., *supra*, at

A159.  The situation is similar for refinancing, where there is a difference of 28.3 percentage

points between blacks and non-minority whites.  *Id.* at A124, A159.

20.     A growing number of research studies and investigations show that significant

racial disparities still exist in lending practices.  *See, e.g.,* California Reinvestment Coalition, et

al., *Paying More for the American Dream: A Multi-State Analysis of Higher Cost Home

Purchase Lending*, (March 2007) *available at*

http://www.nedap.org/pressroom/documents/2007_Report-2005_HMDA.pdf, (hereinafter "2007

CRC Report"); Stephen L. Ross, *The Continuing Practice and Impact of Discrimination*,

(Revised July 2006) (Univ. of Connecticut, Working Paper 2005-19R), *available at*

http://www.econ.uconn.edu/working/2005-19r.pdf.

21.     Recently, the California Reinvestment Coalition, jointly with several other non-

profit and housing advocacy groups, published another report.  The organizations examined the

impact of lending by subprime, lenders in 7 metropolitan areas – Boston, Charlotte, Chicago, Cleveland, Los Angeles, New York City and Rochester, NY. California Reinvestment Coalition, et al., *Paying More for the American Dream: The Subprime Shakeout and its Impact on Lower-Income and Minority Communities*, (March 2008), *available at* http://www.nedap.org/documents/MultistateHMDAreport-Final21.pdf, (hereinafter "2008 CRC Report").

22.     Among other things, the study showed that subprime lenders are concentrated in minority neighborhoods.  Data supporting this finding demonstrated that subprime lenders had 20% of the market share in predominantly minority neighborhoods in the metro areas studied, compared to a 4% market share in predominantly white neighborhoods.  *See* 2008 CRC Report at 5.  In addition, over 40% of the loans made by subprime lenders were in neighborhoods where 80% or more of the residents were minorities.  *Id.*  In stark contrast, less than 10% of subprime lender loans were in areas where less than 10% of the residents were minorities.  *Id.*

23.     In metro Chicago, where all three plaintiffs reside, the same study shows that subprime lenders had 20.5% of the home loan market in neighborhoods where more than 80% of the residents were minorities, while subprime lenders had only 5.6% of the market for home loans in neighborhoods where less than 10% of the residents were minorities.  2008 CRC Report at 17.

24.     The Association of Community Organizations for Reform Now (ACORN) released a report in 2005, finding that "[i]n every metropolitan area where at least 50 refinances were made to African-American homeowners, African-Americans were more likely to receive a high-cost loan than White homeowners."  ACORN Fair Housing, *The High Cost of Credit:*

*Disparities in High-priced Refinanced Loans to Minority Homeowners in 125 American Cities*,

September 27, 2005, at 11, *available at*

http://www.acorn.org/fileadmin/Afforable_Housing/hmda/High_Cost_of_Credit_Report.doc.

      25.     Moreover, and importantly, research studies have suggested that borrowers' credit

profiles cannot fully explain why some borrowers, and not others, are saddled with higher cost

loans.  Researchers have raised "doubts that risk can adequately explain racial differences" in

high-cost loans.  Calvin Bradford, Center for Community Change, *Risk or Race? Racial*

*Disparities and the Subprime Refinance Market,* (May 2002), *available at*

http://www.knowledgeplex.org/kp/report/report/relfiles/ccc_0729_risk.pdf.  In other words,

evidence "suggests that weak borrower credit profiles do not fully explain why some borrowers

get stuck with higher-cost home loans."  2007 CRC Report, *supra* at 7.

**B.**     **COUNTRYWIDE'S DISCRETIONARY PRICING POLICY CONTINUES THE**
        **PERVASIVE DISCRIMINATION AGAINST MINORITIES IN MORTGAGE**
        **LENDING**

      26.     Countrywide is one of the largest mortgage-lending companies in the United

States. Countrywide recently was examined in a study conducted by the California Reinvestment

Coalition, Community Reinvestment Association of North Carolina, Empire Justice Center,

Massachusetts Affordable Housing Alliance, Neighborhood Economic Development Advocacy

Project, and the Woodstock Institute in March of 2007 ("2007 Joint Report").[1] The study

discussed higher cost home purchase lending in six metropolitan areas (including Chicago,

where plaintiffs reside) during 2005 and found significant disparities made to minority and white

borrowers.

---

[1] Income Is No Shield Against Racial Differences In Lending," available at http://ncrc.org.

27.    The 2007 Joint Report included specific Countrywide data relating to disparities. For example, it showed that on average in the six metropolitan areas, blacks are almost 5 times more likely to receive a high APR Countrywide purchase money loan than whites. *Id.* p. 10. (Table 2). In Chicago specifically, blacks are almost 5.6 times more likely to receive a high APR Countrywide purchase money loan than whites. *Id.*

28.    Based on the latest available Home Mortgage Disclosure Act ("HMDA") data, available from the Department of Housing and Urban Development, blacks who borrow from Countrywide are over three times more likely than whites to have received a high-APR loan to purchase a home and over two times more likely to have received a high-APR loan to refinance their home.

29.    In December 2006, Countrywide agreed to settle regulatory allegations in New York State that its practices result in discrimination against minority borrowers. *See*, Press Release, Office of the New York Attorney General, "Countrywide Agrees To New Measures To Combat Racial And Ethnic Disparities In Mortgage Loan Pricing" (Dec. 5, 2006), available at http://www.oag.state.ny.us/press/2006/dec/dec05a 06.html.

30.    Countrywide publicly promotes its home financing expertise by means of nationwide advertising campaigns.  In its advertisements, Countrywide solicits persons to apply for financing with Countrywide either in one of its offices or through one of the mortgage brokers who Countrywide has authorized to accept applications on its behalf.

31.    Countrywide makes home-mortgage loans directly to consumers through its various subsidiaries, including but not limited to Countywide Home Loans and Countrywide Bank.

32.     Countrywide also makes home-mortgage loans that are arranged by its network of mortgage brokers.  Brokers make these loans in reliance on Countrywide's credit-granting policies and with Countrywide's participation.

33.     Countrywide's policies as to where to place its numerous branches and offices and how to market its products show that it was targeting minority borrowers like plaintiffs for subprime loans.

34.     Countrywide's loans are priced based on its internal policies, including but not limited to policies established by Countywide Financial for all Countrywide affiliates.

35.     Countrywide Financial and the other Countywide defendants participated in determining the terms of credit available to plaintiffs, including, without limitation, by targeting plaintiffs for high-cost loans and by making the Discretionary Pricing Policy applicable to their loans.

36.     Countrywide's Discretionary Pricing Policy was unrelated to plaintiffs' objective credit characteristics, such as credit history, credit score, debt-to-income ratio and loan-to-value ratios and results in purely subjective charges that affected the rates otherwise available to plaintiffs.

37.     Countrywide provided its mortgage brokers with substantial information about its loan programs, rates and credit criteria, as well as its policies for compensation.

38.     Countrywide's network of mortgage brokers accepted applications, quoted financing rates and terms (within the limitations set by Countrywide), informed credit applicants of Countrywide's financing options and originated finance transactions using Countrywide's forms, all in accordance with Countrywide's policies.

39.    Countrywide provided its mortgage brokers with credit applications, loan contracts and other required financing forms, as well as instructions on filling out those documents necessary to complete home mortgage transactions.

40.    After plaintiffs provided credit information Countrywide or to one of its mortgage brokers (Ms. Jenkins dealt with a mortgage broker), Countrywide computed a financing rate through objective credit analyses that, in general, discerned the creditworthiness of each plaintiff.

41.    Countrywide's credit analyses considered numerous risk-related variables of creditworthiness, including credit bureau histories, payment amounts, debt ratio, bankruptcies, automobile repossessions, charge-offs, prior foreclosures, payment histories, credit score, debt-to-income ratios, loan-to-value ratios and other risk-related attributes or variables.  On information and belief, Countrywide and/or its mortgage broker used these variables to determine a "mortgage score" for each plaintiff.

42.    Based on these objective risk-related variables and the resulting mortgage score, for each plaintiff Countrywide and/or its mortgage brokers derived a risk-based financing rate at which it would provide a home mortgage, often called the "Par Rate."  Alternatively, experienced Countrywide employees and/or Countrywide's mortgage broker estimated the risk-related Par Rate by referring to each plaintiff's credit bureau-determined credit score.

43.    Although Countrywide's initial analysis applied objective criteria to calculate this risk-related Par Rate, Countrywide also authorized a subjective component in its credit pricing system —the Discretionary Pricing Policy — to impose additional non-risk-related charges.  On information and belief, the applicable Par Rates and authorized discretionary charges were

communicated by Countrywide to its loan officers and mortgage brokers <u>via</u> regularly published "rate sheets."

44.     Each plaintiff paid the discretionary charges as a component of the total finance charge (the "Contract APR"), without knowing that a portion of his or her contract APR was a non-risk-related charge.

45.     Countrywide's loan officers and mortgage brokers had discretion, within the limits set by Countrywide, to impose discretionary mark-ups as additional points in interest – "a rate mark-up", or as points and fees on the loan.  When there was a rate mark-up, as there was in connection with each plaintiff's loan, Countrywide received additional income.

46.     On information and belief, Countrywide's loan officers and mortgage brokers received compensation based, in part, on the amount of discretionary charges added to plaintiffs' loans.  This compensation scheme served as an incentive for defendants' loan officers and mortgage brokers to mark-up each plaintiff's loan.

47.     Countrywide's Discretionary Pricing Policy, by design, caused plaintiffs and the Class to pay a different and higher cost of credit than white borrowers with identical or similar credit scores.  As a result of using a subjective pricing component that is designed to charge persons with the same credit profiles different amounts of finance charge, the objective qualities of the initial credit analysis used to calculate the Par Rate were undermined, and the potential for race bias became inherent in the transaction.

48.     The Discretionary Pricing Policy, although facially neutral (insofar as the Countrywide uses the same or effectively the same policy for all credit applicants), had a disproportionately adverse effect on plaintiffs and the Class compared to similarly situated

whites in that plaintiffs and the Class paid disparately more in discretionary charges (both in frequency and amount) than whites with similar credit qualifications. Statistical analyses of discretionary charges imposed on minority and white customers of mortgage companies that use credit pricing systems structured like Countrywide's have revealed that minorities, such as plaintiffs, are substantially more likely than similarly situated whites to pay such charges, even after controlling for credit risk.

49.     Defendants' application of a Discretionary Pricing Policy and its effects are not unique to plaintiffs, and the discrimination suffered by plaintiffs is not an isolated occurrence. Rather, the Policy constitutes a long-standing, systemic pattern and practice of Countrywide – and other lenders within the subprime mortgage industry - that had an ongoing effect of discrimination against thousands minority homeowners throughout the U.S., like plaintiffs, by way of disparate impact. Countrywide's pattern and practice existed before plaintiffs' loans were originated, continued after plaintiffs' transactions and continues unabated today.

50.     The Discretionary Pricing Policy was Countrywide's standard operating procedure throughout the class period defined below, and it has continued to be standard operating procedure down through the present.

51.     Countrywide's loan officers, mortgage brokers and others are Countrywide's agents for the purpose of setting credit price, which was always set based on the Countrywide's Policy.

52.     The disparate impact plaintiffs suffered is a direct result of Countrywide's Discretionary Pricing Policy in that the Countrywide designed, disseminated, controlled,

implemented and profited from the Discretionary Pricing Policy that created the disparate impact.

53.     Countrywide has a non-delegable duty to ensure that its mortgage financing structure and policies do not have a disparate impact on legally protected classes, such as African-Americans and Latinos.  Despite having such a non-delegable duty, Countrywide chose to use a commission-driven, subjective pricing policy that it knew or should have known had a significant and pervasive adverse impact on minorities such as plaintiffs.

54.     The disparities between the terms of Countrywide's transaction involving plaintiffs and the terms involving whites borrowers with similar credit qualifications are not isolated instances, cannot be the product of chance and cannot be explained by factors unrelated to race, but, instead, are the direct causal result of the use of the discriminatory Discretionary Pricing Policy.

55.     There are no legitimate business reasons justifying Countrywide's use of its discriminatory Discretionary Pricing Policy that could not be achieved by a different policy that has no discriminatory impact or one with greatly reduced discriminatory impact.

## C.     THE DEFENDANTS' DISCRETIONARY PRICING POLICY DISCRIMINATED AGAINST PLAINTIFFS

**Plaintiff Sonia Jenkins**

56.     Ms. Jenkins is black homeowner who resides at 8640 S. Kenwood Avenue, Chicago, Illinois 60619.

57.     On or about April 20, 2007, Ms. Jenkins entered into a mortgage loan transaction with Countrywide. The principal amount of the loan was in the amount of $154,00.00 (Loan # 167628984).

14

58.    Barrister Mortgage brokered the loan.

59.    The loan was a "2 Yr Hybrid LIBOR" adjustable rate mortgage with an initial introductory period of 2 years.  The interest rate during the introductory period was 8.850%, subject to change every 6 months after the introductory period. After factoring the associated costs of the loan, the Annual Percentage Rate was 10.688%.

60.    As part of the refinance, Ms. Jenkins paid various Settlement Charges, amounting to $8,870.00.  These fees included a $3,750.00 "Broker Origination Fee" to Barrister Mortgage, a $500.00 "Broker Processing Fee" to Barrister Mortgage, a $500.00 "Administration Fee" to Barrister Mortgage, and a $695.00 underwriting fee to Countrywide.

61.    In connection with the loan, Countrywide also paid Barrister Mortgage a yield spread premium in the amount of $1,540.00 representing additional commission based on a marked up rate.

62.    True and correct copies of Truth-in-Lending disclosure and HUD-One Settlement Statement provided in connection with Ms. Jenkins' loan are attached hereto and labeled Exhibit 1 and Exhibit 2, respectively.

63.    On information and belief, unbeknownst to Ms. Jenkins, the contract APR on the mortgage loan was actually a combination of an objective, risk-based calculation and a totally subjective, discretionary component added pursuant to the Countrywide's Discretionary Pricing Policy.

64.    Countrywide did not offer Ms. Jenkins its less expensive loan products that were available to borrowers with similar credit characteristics.

15

65.     On information and belief, Ms. Jenkins was subject to the Countrywide's Discretionary Pricing Policy.

66.     On information and belief, Countrywide charged Ms. Jenkins a disproportionately greater amount in non-risk-related credit charges than it charges similarly situated white persons.

**Plaintiff German Pena**

67.     German Pena is a Latino or Hispanic homeowner who resides with his family at 3815 N. Osceola Avenue in Chicago, Illinois, 60634.

68.     On or about August 15, 2005, Mr. Pena entered into a residential, purchase money mortgage loan transaction with Countrywide Bank, N.A.  The principal amount of financing he obtained was in excess of $331,000.

69.     Mr. Pena received his loan from Countywide Bank, N.A., through a Countrywide Home Loans branch located on Halsted Street in Chicago.

70.     Countrywide gave Mr. Pena an "80/20" product consisting of a conventional loan with an adjustable interest rate and an amount financed of $294,533.13 and a home equity line of credit ("HELOC") in the amount of $37,000 with an adjustable interest rate.  The HELOC rate started at 9.125% and could go as high as 18%.

71.     True and correct copies of the TILA Statement for the first loan and of the HELOC agreement for the second loan are attached hereto as Exhibits 3 and 4, respectively.

72.     As part of the transaction, Mr. Pena also paid various Settlement Charges to Countrywide, some of which and/or portions of which were discretionary.

73.     On information and belief, unbeknownst to Mr. Pena, the contract APR on the mortgage loan was actually a combination of an objective, risk-based calculation and a totally

16

subjective, discretionary component added pursuant to the Countrywide's Discretionary Pricing Policy.

74.     Countrywide did not offer Mr. Pena its less expensive loan products that were available to borrowers with similar credit characteristics.

75.     On information and belief, Mr. Pena was subject to the Countrywide's Discretionary Pricing Policy.

76.     On information and belief, Countrywide charged Mr. Pena a disproportionately greater amount in non-risk-related credit charges than it charges similarly situated white persons.

**Plaintiff Bernice Smith**

77.     Ms. Smith is an African-American homeowner who resides at 4803 S. Forrestville, Chicago, Illinois, 60615.

78.     On or about February 10, 2006, Ms. Smith entered into a mortgage transaction with Ms. Smith.  The principal amount of the loan was $399,500.

79.     M. Smith received her loan from Countrywide Bank, N.A., through a Countrywide Home Loans' branch in Orland Park, Illinois.

80.     The loan was a complex, Pay-Option ARM loan with a one-month, introductory "teaser" rate of 2.0%.  Thereafter, the rate can jump to as high as 9.95% and adjusts on a monthly basis.

81.     If plaintiff opted to make the lowest monthly payment, that amount would not be sufficient to cover the accruing interest. After the first year, accrued interest becomes additional principal.  In this manner, the loan would be negatively amortizing, and the principal balance of

the loan could grow to 115% of the original principal amount of the loan, i.e., a home equity loss of nearly $60,000.

82.     The Option ARM was among the most costly products Countrywide could have given Ms. Smith.

83.     As part of the refinance, Countrywide also charged plaintiff $10,820.35 in Settlement Charges, including a $4,494.38 "loan discount" fee.

84.     True and correct copies of plaintiff's Truth-in-Lending disclosure, Note, Option ARM disclosure, and HUD-1 Settlement Statement are attached hereto as <u>Exhibits 5, 6, 7 & 8</u>, respectively.

85.     On information and belief, unbeknownst to Ms. Smith, the contract APR on the mortgage loan was actually a combination of an objective, risk-based calculation and a totally subjective, discretionary component added pursuant to the Countrywide's Discretionary Pricing Policy.

86.     Countrywide did not offer Ms. Smith its less expensive loan products that were available to borrowers with similar credit characteristics.

87.     On information and belief, Ms. Smith was subject to the Countrywide's Discretionary Pricing Policy.

88.     On information and belief, Countrywide charged Ms. Smith a disproportionately greater amount in non-risk-related credit charges than it charges similarly situated white persons.

### DISCOVERY/CONTINUING VIOLATION (Tolling)

89.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

18

90.     While long suspected, mortgage lending discrimination has only recently been disclosed and quantified. It has only been in the last few years that mortgage lenders have been required to submit details of their subprime home loans under the Home Mortgage Disclosure Act. The groups that have studied predatory lending and the mortgage market have uncovered incredible racial disparities in the types of mortgages offered, some of which are summarized above.

91.     Defendants' pattern and practice of discretionary pricing and its racially discriminatory effects on minority homeowners have only become apparent relatively recently.

92.     Defendants' long-standing and continuing pattern and practice of discretionary pricing and racial discrimination constitutes an unbroken, ongoing violation of the Fair Housing Act and the Equal Credit Opportunity Act.

93.     The causes of action alleged herein accrued upon discovery of the discriminatory impact of the Defendants' Discretionary Pricing Policy. Plaintiffs and members of the Class did not discover and could not have discovered through the exercise of reasonable diligence the factual bases of those claims. Indeed, the data forming the basis of Plaintiffs' claims only recently was released and analyzed in a comprehensive manner. Moreover, because Defendants' Discretionary Pricing Policy was not disclosed, plaintiffs and the Class were ignorant of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part.

94.     Commission-driven, discretionary pricing systems, such as those used in the mortgage industry and structurally similar to the system utilized by the Defendants, have been found to produce significant discriminatory effects. Knowledge concerning the significant and

pervasive discriminatory impact of such credit pricing systems has been widely circulated within the financing industry for several years, as a result of numerous actions by the United States Department of Justice and federal regulatory agencies. *See*, Facts, section A, *supra*. For this reason, the Defendants knew or should have known that their credit pricing system causes minority homeowners to pay more for mortgage financing than the amounts paid by white customers with identical or effectively identical credit scores.

95.     Despite the fact that the Defendants knew or should have known of the discriminatory effect of their Discretionary Pricing Policy, none of the loan documents inform the customer that its finance rates ultimately are subjective and not based solely on risk-related characteristics.

96.     The Defendants were and are under a continuous non-delegable duty to disclose to the plaintiffs and Class material information regarding their loans. The fact that certain loan terms are subjective and discretionary is information a reasonable borrower would consider important when deciding whether to accept the loan and on what terms. The fact that the subjective and discretionary components result in a disparate impact on minorities is also information a reasonable minority borrower would consider important.

97.     Plaintiffs and the Class members reasonably believed that the terms of their loans would be based on their creditworthiness and that all material information about the credit price was disclosed. They had no reason to suspect otherwise.

98.     The Defendants' financing documents fostered the appearance that the Defendants offer competitive rates that objectively are set. However, the Defendants never disclosed to its credit applicants the fact that: (a) its credit rates are subjective and can vary

significantly among persons with identical credit profiles; and (b) it had authorized and provided a financial incentive to loan officers, mortgage brokers and others to subjectively increase the credit rate above the rate otherwise available to the homeowner.

99.     Due to the inherent nature of the Defendants' undisclosed Discretionary Pricing Policy, the Defendants' minority customers had no way of knowing or suspecting: (a) the existence of the Defendants' subjective credit pricing policy; (b) that they were charged additional, subjectively-imposed, credit costs; (c) that they were charged a disproportionately greater amount for their cost of credit than similarly situated white persons, and or (d) that any part of the loan price was negotiable.

100.    The Defendants were or should have been aware that the Discretionary Pricing Policy had a disparate impact on minority borrowers.  Even in the face of this information, the Defendants continued affirmatively to authorize the use of the Discretionary Pricing Policy without disclosure to its borrowers.

101.    The Defendants shared in the profit realized by the use of the Discretionary Pricing Policy.

102.    Further, the "teaser rate" structure of many of the loan products offered by the Defendants, such as the Adjustable Rate Mortgage ("ARM") and the negatively amortizing "Option ARM," facilitated the Discretionary Pricing Policy and the pattern and practice of racial discrimination.  That is to say, Defendants' ARM products were designed to ensure that the loans would need to be refinanced quickly, long before their maturity date, and generally before two or three years had elapsed, at which point the rates would start adjusting upwards.  Refinancing out of these dangerous products required that Plaintiffs expose themselves again and repeatedly to

the Defendants' Discretionary Pricing Policy.  All three plaintiffs found themselves in this situation.

103.     Finally, the aggregate, comparative nature of the disparate impact of Defendants' loan terms on minorities could not have been known to any individual plaintiff until such time as he or she met with legal counsel.

104.     Plaintiffs did not become aware of Defendants' Discretionary Pricing Policy or of its disparate effects in their transactions until they met with present legal counsel.

105.     For these reasons, Defendants are estopped from relying on any statutes of limitation in their defenses of this action.

## CLASS ALLEGATIONS

106.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

107.     Plaintiffs sue on their own behalf and on behalf of a class of persons under Rules 23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

108.     This class action is brought pursuant to the ECOA and the FHA by the individual named plaintiffs on behalf of themselves and all minority consumers (the "Class") who obtained a home mortgage loan from the Defendants in the United States between January 1, 2001, and the date judgment is entered in this case (the "Class Period") and who were subject to the Defendants' Discretionary Pricing Policy pursuant to which they paid discretionary points, fees and/or interest mark-ups in connection with their loan.

109.     The phrase "Discretionary Pricing Policy" refers to the Defendants' policy of authorizing its brokers to impose subjective, discretionary charges and interest mark-ups that are included in the finance charge loans they originate.  The Defendants' Discretionary Pricing

Policy constitutes a pattern and practice of discrimination that existed throughout the Class

Period.

110.     Plaintiffs do not know the exact size or identities of the proposed Class, since

such information is in the exclusive control of the Defendants.  Plaintiffs believe that the Class

encompasses many thousands or tens of thousands of individuals who are dispersed

geographically throughout the United States.  Therefore, the proposed class is so numerous that

joinder of all members is impracticable.

111.     All members of the Class have been subject to and affected by the same

Discretionary Pricing Policy.  There are questions of law and fact that are common to the Class,

and predominate over any questions affecting only individual members of the Class.  These

questions include, but are not limited to the following:

a.     the nature, scope and operations of  Defendants' Discretionary Pricing

Policy;

b.     whether Defendants are creditors under the ECOA because, for example,

in the ordinary course of its business they participate in decisions as to whether or not to extend

credit to consumers;

c.     whether  the Defendants' Discretionary Pricing Policy is a facially neutral

credit pricing system that has resulted in racial discrimination in violation of ECOA;

d.     whether there are statistically significant disparities between the amount of

the discretionary charges imposed on minority persons and the amount of the discretionary

charges imposed on white persons, where the disparities are unrelated to differences in

creditworthiness;

e.    whether any legitimate business reason that may exist for Defendants' use of the Discretionary Pricing Policy could be achieved by a credit pricing system that is less discriminatory in its impact;

f.    whether the Court can enter declaratory and injunctive relief; and

g.    the proper measure of disgorgement or damages.

112.    The claims of the individual named plaintiffs are typical of the claims of the Class and do not conflict with the interests of any other members of the Class in that all three plaintiffs and the other members of the Class were subject to the same Discretionary Pricing Policy that has disproportionately affected minority homeowners.

113.    The individual named plaintiffs will fairly and adequately represent the interests of the Class. They are committed to the vigorous prosecution of the Class' claims and have retained attorneys who are qualified to pursue this litigation and have experience in class actions and in consumer protection and discrimination actions in particular.

114.    A class action is superior to other methods for the fast and efficient adjudication of this controversy.  A class action regarding the issues in this case does not create any problems of manageability.

115.    In the alternative, Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## <u>COUNT I</u>
## DISCRIMINATION IN VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT

116.    Plaintiffs repeat and re-allege every allegation above, as if set forth herein in full.

117.    Each defendant is a creditor as defined in ECOA, and in the ordinary course of its business, participated in the decision of whether or not to extend credit to one or more plaintiffs.

118.    Countrywide designed, disseminated, controlled, implemented and profited from the discriminatory policy and practice alleged herein — the Discretionary Pricing Policy — which has had a disparate, economic impact on plaintiffs compared to similarly situated whites.

119.    All actions taken by Countrywide's employees and agents were in accordance with the specific authority granted to them by Countrywide and were in furtherance of Countrywide's policies and practices.

120.    As a result of the Countrywide's Discretionary Pricing Policy, Countrywide has collected more in finance charges from plaintiffs than from similarly situated white persons, and for reasons unrelated to credit risk.

121.    Countrywide's Discretionary Pricing Policy violates the Equal Credit Opportunity Act.

122.    Plaintiffs are aggrieved persons, as defined in the ECOA, by virtue of having been subject to the Countrywide's discriminatory Discretionary Pricing Policy.

## COUNT II
### DISCRIMINATION IN VIOLATION OF THE FAIR HOUSING ACT

123.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

124.    Countrywide engaged in a residential real estate-related transaction with each plaintiff.

125.    Countrywide's Discretionary Pricing Policy has resulted in discrimination with respect to each plaintiff.

126.    As a result of the Countrywide's Discretionary Pricing Policy, Countrywide has collected more in finance charges from plaintiffs than from similarly situated white persons, and for reasons unrelated to credit risk.

127.    Countrywide's Discretionary Pricing Policy violates the Fair Housing Act and constitutes actionable discrimination on the basis of race.

128.    Plaintiffs are aggrieved persons, as defined in FHA, by virtue of having been subject to the Countrywide's discriminatory, Discretionary Pricing Policy.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request the following relief from this Court:

a.    Enter a judgment, pursuant to 15 U.S.C. §1691e(c) and/or 42 U.S.C. §3613, declaring the acts and practices of Countrywide complained of herein to be in violation of the ECOA and the FHA;

b.    Grant a permanent or final injunction, pursuant to 15 U.S.C. 1691e(c) and/or 42 U.S.C. §3613(c), enjoining Countrywide, and Countrywide's agents and employees, affiliates and subsidiaries, from continuing to discriminate against plaintiffs and the Class because of their race or ethnicity through further use of the Discretionary Pricing Policy or any other non-risk-related discretionary pricing policy employed by Countrywide;

c.    Order Countrywide, pursuant to 15 U.S.C. §1691e(c) and/or 42 U.S.C. §3613(c), to adopt and enforce a policy that requires appropriate training of Countrywide's employees, brokers and agents to prevent discrimination;

d.    Order disgorgement, pursuant to 15 U.S.C. §1691e(c), of all disproportionate non-risk charges imposed on plaintiffs and the Class members by Countrywide's Discretionary

26

Pricing Policy; and order the equitable distribution of such charges to Ms. Plaintiffs and the Class, together with other relief for unjust enrichment;

e.     Order actual and punitive damages and/or restitution to plaintiffs and the Class, pursuant to 42 U.S.C. § 3613(c);

f.     Award plaintiffs the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees, pursuant to 15 U.S.C. § 1691e(d) and/or 42 U.S.C. § 3613(c); and

g.     Grant plaintiffs and the Class such other and further relief as this Court finds necessary and proper.

<u>**JURY TRIAL DEMANDED**</u>

Plaintiffs respectfully demand a trial by jury on all issues so triable.

Respectfully submitted
on behalf of Ms. Jenkins,


<u>*s/Al Hofeld, Jr.*</u>
Al Hofeld, Jr.
LAW OFFICES OF AL HOFELD, JR., LLC
AND THE SOCIAL JUSTICE PROJECT, INC.
208 S. LaSalle Street, Suite #1650
Chicago, IL 60604
Phone (312) 345-1004
Fax (312) 346-3242


Dated: June 27, 2008

### NOTICE OF LIEN

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards.

s/Al Hofeld, Jr.
Al Hofeld, Jr.


Al Hofeld, Jr.
LAW OFFICES OF AL HOFELD, JR., LLC
and The Project for Social Justice, Inc.
208 S. LaSalle Street, Suite #1650
Chicago, Illinois 60604
Phone - (312) 345-1004
Fax – (312) 346-3242
al@alhofeldlaw.com


### NOTICE OF FILING AND CERTIFICATE OF SERVICE BY ELECTRONIC MEANS

I, Al Hofeld, Jr., attorney for plaintiffs, hereby certify that on June 27, 2008, notice and service of the attached ***Plaintiffs' First Amended Complaint*** was accomplished pursuant to ECF as to Filing Users, and I shall comply with LR 5.5 as to any party who is not a Filing User or represented by a Filing User.

 s/Al Hofeld, Jr.
Al Hofeld, Jr.

# EXHIBIT 1

Prepared by: PHILIP M. VILLA

# TRUTH IN LENDING DISCLOSURE STATEMENT
## (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

LENDER: Countrywide Home Loans, Inc. dba America's Wholesale Lender

4500 Park Granada
Calabasas, CA 91302-1613

☐ Preliminary ☒ Final

DATE 04/20/2007

BORROWERS: SONIA JENKINS

LOAN 167628984

CASE NO.

Type of Loan SUBPRIME - B/C
2 Yr Hybrid LIBOR

ADDRESS 8640 S KENWOOD AVE
CITY STATE / ZIP CHICAGO, IL 60619-6416
PROPERTY 8640 S KENWOOD AVE
CHICAGO, IL 60619-6416

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 10.688 % | $ 509,168.58 | $ 148,034.96 | $ 657,203.54 |

**PAYMENT SCHEDULE:**

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | WHEN PAYMENTS ARE DUE |
|---|---|---|
| 24 | 1,170.14 | MONTHLY BEGINNING 06/01/2007 |
| 6 | 1,335.35 | MONTHLY BEGINNING 06/01/2009 |
| 449 | 1,380.21 | MONTHLY BEGINNING 12/01/2009 |
| 1 | 1,393.79 | LAST PAYMENT DUE 05/01/2047 |

**DEMAND FEATURE:** ☒ This loan does not have a Demand Feature. ☐ This loan has a Demand Feature as follows:

**VARIABLE RATE FEATURE:**
☒ This loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

**SECURITY:** You are giving a security interest in the property located at:
8640 S KENWOOD AVE, CHICAGO, IL 60619-6416

**ASSUMPTION:** Someone buying this property ☒ cannot assume the remaining balance due under original mortgage terms
☐ may assume, subject to lender's conditions, the remaining balance due under original mortgage terms.

**PROPERTY INSURANCE:** Hazard insurance, including flood insurance if the property is in a Special Flood Hazard Area, is required as a condition of this loan. You may obtain the insurance coverage from any insurance company acceptable to the lender. Complete details concerning insurance requirements will be provided prior to loan closing.

**LATE CHARGES:** If your payment is more than 15 days late, you will be charged a late charge of 5.000%
of the overdue payment.

**PREPAYMENT:** If you pay off your loan early, you
☐ may ☒ will not · be entitled to a refund of part of the finance charge.
☐ may ☒ will not have to pay a penalty.

See your contract documents for any additional information regarding non-payment, default, required repayment in full before scheduled date, and prepayment refunds and penalties.

"e" means an estimate

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

LOAN #: 167628984

# DEFINITION OF TRUTH-IN-LENDING TERMS

## ANNUAL PERCENTAGE RATE

This is not the Note rate for which the borrower applied. The Annual Percentage Rate (APR) is the cost of the loan in percentage terms taking into account various loan charges of which interest is only one such charge. Other charges which are used in calculation of the Annual Percentage Rate are Private Mortgage Insurance or FHA Mortgage Insurance Premium (when applicable) and Prepaid Finance Charges (loan discount, origination fees, prepaid interest and other credit costs). The APR is calculated by spreading these charges over the life of the loan which results in a rate higher than the interest rate shown on your Mortgage/Deed of Trust Note.

## PREPAID FINANCE CHARGES

Prepaid Finance Charges are certain charges made in connection with the loan and which must be paid upon the close of the loan. These charges are defined by the Federal Reserve Board in Regulation Z and the charges must be paid by the borrower only, and not the seller if applicable. Non-Inclusive examples of such charges are: Loan origination fee, "Points" or Discount, Private Mortgage Insurance or FHA Mortgage Insurance, Tax Service Fee. Some loan charges are specifically excluded from the Prepaid Finance Charge such as appraisal fees and credit report fees.

Prepaid Finance Charges are totaled and then subtracted from the Loan Amount (the face amount of the Deed of Trust/Mortgage Note). The net figure is the Amount Financed as explained below.

## FINANCE CHARGE

The amount of interest, prepaid finance charge and certain insurance premiums (if any) which the borrower will be expected to pay over the life of the loan.

## AMOUNT FINANCED

The Amount Financed is the loan amount applied for less the prepaid finance charges. Prepaid finance charges can be found on the Good Faith Estimate. For example if the borrower's note is for $100,000 and the Prepaid Finance Charges total $5,000, the Amount Financed would be $95,000. The Amount Financed is the figure on which the Annual Percentage Rate is based.

## TOTAL OF PAYMENTS

This figure represents the total of all payments made toward principal, interest and mortgage insurance (if applicable).

## PAYMENT SCHEDULE

The dollar figures in the Payment Schedule represent principal, interest, plus Private Mortgage Insurance (if applicable). These figures will not reflect taxes and insurance escrows or any temporary buydown payments contributed by the seller.

# EXHIBIT 2

OMB No. 2502-0265

**Page 1**

| A. | CHICAGO TITLE INSURANCE COMPANY CHICAGO TITLE AND TRUST COMPANY | B. TYPE OF LOAN | | |
|---|---|---|---|---|

CLOSER: LAURA DEBELINA
DATE OF PRINTING: 04/20/07
TIME OF PRINTING: 17:28

SETTLEMENT STATEMENT
U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

| 1. ☐ FHA | 2. ☐ FmHA | 3. ☒ CONV. UNINS. |
| 4. ☐ VA | 5. ☐ CONV. INS. | |
| 6. File Number: | SA3915130 | |
| | 027031115-001 LAN NA | |
| 7. Loan Number 167628984 | |
| 8. Mortgage Insurance Case Number | |

**C. NOTE:** This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

**D. NAME OF BORROWER:** SONIA JENKINS
**ADDRESS:** 8640 SOUTH KENWOOD AVENUE
CHICAGO ILLINOIS 60619

**E. NAME OF SELLER:**
**ADDRESS:**

**F. NAME OF LENDER:** COUNTRYWIDE HOME LOANS, INC. d/b/a, SEE ATTACHED
**ADDRESS:** 2375 NORTH GLENVILLE DRIVE
RICHARDSON TEXAS 75082

**G. PROPERTY LOCATION:** 8640 S. KENWOOD AVENUE
CHICAGO ILLINOIS 60619

**H. SETTLEMENT AGENT:** CHICAGO TITLE AND TRUST COMPANY
**ADDRESS:** 3225 N. ASHLAND AVENUE
CHICAGO ILLINOIS 60657
**PLACE OF SETTLEMENT:**
**ADDRESS:** 3225 N. ASHLAND AVENUE
CHICAGO ILLINOIS 60657

**I. SETTLEMENT DATE:**
April 20, 2007

**DISBURSEMENT DATE:**
April 25, 2007

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER:** | | **400. GROSS AMOUNT DUE TO SELLER:** | |
| 101. Contract sales price | | 401. Contract sales price | |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement charges to borrower (line 1400) | 8,870.04 | 403. | |
| 104. PAYOFF TO COUNTRYWIDE HOME LOANS | 119,777.29 | 404. | |
| 105. PAYOFF TO PATTY YOUNG | 16,745.00 | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106. City/town taxes to | | 406. City/town taxes to | |
| 107. County taxes to | | 407. County taxes to | |
| 108. Assessments to | | 408. Assessments to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 120. GROSS AMT DUE FROM BORROWER | 145,392.33 | 420. GROSS AMT DUE TO SELLER | |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER:** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER:** | |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 154,000.00 | 502. Settlement charges to seller (line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| | | 504. Payoff of first mortgage loan | |
| 204. | | | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City/town taxes to | | 510. City/town taxes to | |
| 211. County taxes to | | 511. County taxes to | |
| 212. Assessments to | | 512. Assessments to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| 220. TOTAL PAID BY/FOR BORROWER | 154,000.00 | 520. TOTAL REDUCTIONS AMT DUE SELLER | |

Page 2     OMB No. 2502-0265

ORD#/ABS#   SA3915130
ESC#     027031115     LAN   NA

## L. SETTLEMENT CHARGES

TIME OF PRINTING: 17:28
DATE OF PRINTING: 04/20/07

| | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|
| **700.** | **TOTAL SALES/BROKER'S COMMISSION based on price** $ @ %= | | |
| | Division of Commission (line 700) as follows: | | |
| 701. | LB: $ to | | |
| 702. | SB: $ to | | |
| 703. | Commission paid at Settlement (Money retained by broker applied to commission $ ) | | |
| 704. | Other sales agent charges: | | |
| 705. | Additional commission: $ to | | |
| **800.** | **ITEMS PAYABLE IN CONNECTION WITH LOAN** | | |
| 801. | Loan Origination Fee % | | |
| 802. | Loan Discount % | | |
| 803. | Appraisal Fee to | | |
| 804. | Credit Report to LANDSAFE CREDIT INC. | 12.00 | |
| 805. | Lender's Inspection Fee to | | |
| 806. | Mortgage Insurance Application Fee to | | |
| 807. | Assumption Fee to | | |
| 808. | BROKER ORIGINATION FEE TO BARRISTER MORTGAGE | 3,750.00 | |
| 809. | BROKER PROCESSING FEE TO BARRISTER MORTGAGE | 500.00 | |
| 810. | BROKER ADMINISTRATION FEE TO BARRISTER MORTGAGE | 500.00 | |
| 811. | PREMIUM PD TO BARRISTER MTG BY LENDER $1540.00 POC | | |
| 812. | ADDITIONAL ITEMS PAYABLE IN CONNECTION WITH LOAN (ATTACHED) | 811.00 | |
| **900.** | **ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | |
| 901. | Interest from 04/25/07 to 05/01/07 @$ 37.3400 /day for 6 days | 224.04 | |
| 902. | Mortgage Insurance Premium for 0.00 months to | | |
| 903. | Hazard Insurance Premium for 1.00 years to STATE FARM | 2,064.00 | |
| 904. | | | |
| 905. | | | |
| **1000.** | **RESERVES DEPOSITED WITH LENDER** | | |
| 1001. | Hazard insurance 0.00 month @$ per month | | |
| 1002. | Mortgage insurance 0.00 month @$ per month | | |
| 1003. | City property taxes 0.00 month @$ per month | | |
| 1004. | County property taxes 0.00 month @$ per month | | |
| 1005. | Annual assessments 0.00 month @$ per month | | |
| 1006. | 0.00 month @$ per month | | |
| 1007. | 0.00 month @$ per month | | |
| 1008. | Aggregate Accounting Adjustment | 0.00 | 0.00 |
| **1100.** | **TITLE CHARGES** | | |
| 1101. | Settlement or Closing Fee to CHICAGO TITLE AND TRUST COMPANY | 130.00 | |
| 1102. | Abstract or title search to | | |
| 1103. | Title examination to CHICAGO TITLE INSURANCE COMPANY | 300.00 | |
| 1104. | Title insurance binder to | | |
| 1105. | Document preparation to | | |
| 1106. | Notary fees to | | |
| 1107. | Attorney's fee to | | |
| 1108. | Title insurance to CHICAGO TITLE INSURANCE COMPANY | 295.00 | |
| | (includes above items numbers:) | | |
| 1109. | Lender's coverage $ 153,750.00 $ 420.00 | | |
| 1110. | Owner's coverage $ 0.00 $ | | |
| 1111. | EXPRESS DELIVERY FEE TO CT&T | 50.00 | |
| 1112. | 12 MONTH CHAIN OF TITLE | 125.00 | |
| 1113. | STATE OF IL REG. FEE TO CTI | 3.00 | |
| **1200.** | **GOVERNMENT RECORDING AND TRANSFER CHARGES** | | |
| 1201. | Recording fees: Deed $ 36.00 ; Mortgage $ 70.00 ; Release $ | 106.00 | |
| 1202. | City/county tax/stamps: Deed $ ; Mortgage $ | | |
| 1203. | State tax/stamps: Deed $ ; Mortgage $ | | |
| 1204. | | | |
| 1205. | | | |
| **1300.** | **ADDITIONAL SETTLEMENT CHARGES** | | |
| 1301. | Survey to | | |
| 1302. | Pest inspection to | | |
| 1303. | | | |
| 1304. | | | |

Case 1:08-cv-02935    Document 17-2    Filed 06/27/2008    Page 7 of 32

| ORD#/ABS# | SA3915130 | | **SUPPLEMENTAL PAGE** | TIME OF PRINTING: 17:28 |
| ESC# | 027031115 | LAN  NA | | DATE OF PRINTING: 04/20/07 |

### ADDITIONAL BUYER SETTLEMENT CHARGES

|  |  |  | CHARGE AMOUNT |
|---|---|---|---|
| 812.001 | TAX SERVICE FEE TO COUNTRWIDE TAX SER. | $ | 90.00 |
| 812.002 | FLOOD CHECK FEE TO LANDSAFE FLOOD DET. | | 26.00 |
| 812.003 | UNDERWRITING FEE TO COUNTRYWIDE HOME LOA | | 695.00 |

TOTAL ADDITIONAL ITEMS PAYABLE IN CONNECTION WITH LOAN   (LINE 812) $          811.00
================

### ADDITIONAL SELLER SETTLEMENT CHARGES

CHARGE AMOUNT

### ADDITIONAL LENDER SETTLEMENT LOANS

LOAN AMOUNT

| 202.001 | COUNTRYWIDE HOME LOANS, INC. d/b/a | $ | 154,000.00 |

TOTAL Additional Settlement Loans to Lender (LINE 202)      $       154,000.00
================

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction, I further certify that I have received a copy of the HUD-1 Settlement Statement.

_SONIA JENKINS_

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds  which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

_____     _____     4/20/07
Settlement Agent                            Date

WARNING: It is a crime to knowingly make false statements to the United States on this or any similar form. Penalties upon conviction can include a fine and imprisonment. For details see:
         Title 18 U.S. Code Section 1001 and Section 1010.

# EXHIBIT 3

Prepared by: CONNIE GALLEGOS

## TRUTH IN LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

LENDER: Countrywide Bank, a Division of Treasury Bank, N.A.

1199 North Fairfax St. Ste.500
Alexandria, VA 22314

[ ] Preliminary   [X] Final
DATE 08/15/2005

BORROWERS: GERMAN PENA

LOAN 110456801
CASE NO.
Type of Loan CONV UNINSURED
NonConf ARM MTA
PayOption 1mo

ADDRESS       4319 N. SPAULDING
CITY STATE / ZIP CHICAGO, IL 60618
PROPERTY      3815 N OSCEOLA Ave
              CHICAGO, IL 60634-3309

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 6.131 % | $ 404,188.05 | $ 294,533.13 | $ 698,721.18 |

PAYMENT SCHEDULE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | WHEN PAYMENTS ARE DUE |
|---|---|---|
| 12 | 952.05 | MONTHLY BEGINNING 10/01/2005 |
| 12 | 1,023.45 | MONTHLY BEGINNING 10/01/2006 |
| 12 | 1,100.21 | MONTHLY BEGINNING 10/01/2007 |
| 12 | 1,182.73 | MONTHLY BEGINNING 10/01/2008 |
| 12 | 1,271.43 | MONTHLY BEGINNING 10/01/2009 |
| 299 | 2,107.87 | MONTHLY BEGINNING 10/01/2010 |
| 1 | 2,309.61 | LAST PAYMENT DUE  09/01/2035 |

DEMAND FEATURE: [X] This loan does not have a Demand Feature.    [ ] This loan has a Demand Feature as follows:

VARIABLE RATE FEATURE:
[X] This loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

SECURITY: You are giving a security interest in the property located at:

3815 N OSCEOLA AVE, CHICAGO, IL 60634-3309

ASSUMPTION: Someone buying this property    [ ] cannot assume the remaining balance due under original mortgage terms
[X] may assume, subject to lender's conditions, the remaining balance due under original mortgage terms.

PROPERTY INSURANCE: Hazard insurance, including flood insurance if the property is in a Special Flood Hazard Area, is required as a condition of this loan. You may obtain the insurance coverage from any insurance company acceptable to the lender. Complete details concerning insurance requirements will be provided prior to loan closing.

LATE CHARGES: If your payment is more than 15   days late, you will be charged a late charge of    5.000 % of the overdue payment

PREPAYMENT: If you pay off your loan early, you

[ ] may  [X] will not   have to pay a penalty.
[ ] may  [X] will not   be entitled to a refund of part of the finance charge.

See your contract documents for any additional information regarding non-payment, default, required repayment in full before scheduled date, and prepayment refunds and penalties.
* = means estimate

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

_____   BORROWER/DATE          _____   BORROWER/DATE

_____   BORROWER/DATE          _____   BORROWER/DATE

PHNVACONV
* Truth In Lending Disclosure
*3-US (08/04)(d)

Page 1 of 2

# EXHIBIT 4

Prepared by: CONNIE GALLEGOS

Countrywide Bank, a Division of Treasury
Bank, N.A.

DATE:       08/12/2005
BORROWER: GERMAN PENA
CASE #:
LOAN #:     110456793
PROPERTY ADDRESS: 3815 N OSCEOLA AVE
                  CHICAGO, IL 60634-3309

Branch #: 0001399
1601 S. HALSTED
CHICAGO, IL 60608
Phone: (312)421-8799
Br Fax No.: (312)421-9037

## HOME EQUITY CREDIT LINE AGREEMENT AND
## DISCLOSURE STATEMENT
### THIS LOAN IS SECURED BY A JUNIOR MORTGAGE

Date: AUGUST 15, 2005

This Home Equity Credit Line Agreement and Disclosure Statement ("Agreement") governs my Home Equity Credit Line Account ("Account") with you,
Countrywide Bank, a Division of Treasury Bank, N.A.
The words "I," "me" and "my" refer to the Borrower signing this Agreement. If more than one Borrower signs this Agreement, the words "I," "me" and "my" refer to all who sign, separately and together. The words "you" and "your" refer to
Countrywide Bank, a Division of Treasury Bank, N.A.

**1. LOANS; DRAW AND REPAYMENT PERIOD.** Subject to the limitations explained in this Agreement, upon my request for loans, you agree to lend money to me from time to time until the last day of the sixtieth (60th) consecutive calendar month following the date set forth above ("Initial Draw Period," or until the last day of any renewed Draw Period, up to my Credit Limit indicated in paragraph 4 below. (You will not make any loans if my Account is sooner terminated or suspended under paragraphs 11.B, 11.D, 12.B or 15.A below.) You will not make any loan before the fourth business day following the signing of this Agreement, except to the extent of proceeds of this loan that are for the purchase or initial construction of the Property.

I agree that prior to the end of the Initial Draw Period, you have the right to review my Account to decide whether such Initial Draw Period will be renewed. Unless you have sent me written notice not later than the sixtieth (60th) day before the Initial Draw Period ends that you have decided not to renew such Initial Draw Period, such Initial Draw Period will automatically renew for one additional sixty (60) month period, and the Draw Period on my Account shall thereafter be considered to be 120 months for purposes of this Agreement. If the Initial Draw Period is not renewed, then the Draw Period on my Account shall thereafter be considered to be 60 months for purposes of this Agreement.

After the Draw Period ends, I will no longer be able to obtain loans and then must pay the outstanding balance over the specified Repayment Period unless my Account is sooner terminated under paragraph 12.B below, in which case my Account is due and payable in full at the time of such termination. The Repayment Period shall be 180 months.

**2. MAKING LOANS.** You will make loans under this Agreement by (i) honoring Equity Credit Line Checks you provide to me requesting advances of at least $250; (ii) paying closing costs and finance charges in accordance with paragraph 7.C below; (iii) paying certain other amounts on my behalf in accordance with my disbursement authorization provided to you at or before the time I sign this Agreement; (iv) paying any unpaid taxes, assessments, property insurance or other sums as provided under the Agreement or the Mortgage; or (v) any other method or procedure you establish.

**3. PROMISE TO PAY; MINIMUM PAYMENT; METHOD OF PAYMENT.**

A. I promise to pay to your order, when and as due, all loans made under this Agreement, plus all unpaid finance charges, insurance premiums, collection costs and other charges I owe to you now or in the future. I agree to make my payments in the manner specified in my periodic statement, and if I do so such payments will be credited as of the day of receipt.

B. At a minimum, you will send me a periodic statement monthly. The periodic statement will show all Account activity during the billing cycle and contain other important information, including my "New Balance," my Annual Percentage Rate, the amount of my "Minimum Payment Due," my "Payment Due Date" and the place and manner of making payments.

C. I may pay all or part of my "New Balance" at any time, subject to an Account Termination Fee or Low Balance Fee, as applicable, as described in paragraph 7.D and 6.B(5), respectively (known as a "prepayment penalty" under federal law).

* HELOC - 1. Agreement & Disclosure
  2005P-IL (10/04)/40

Page 1 of 9

Initials: 



LOAN #: 110456793

D. I may pay all or any part of my "New Balance" using an Equity Credit Line Check ("Check"). If I use a Check to pay all or any part of my New Balance, I understand that:

(1) The amount of the Check will be treated as any other advance is treated under the terms and conditions of my Account. My Check will not be honored if I do not have sufficient availability on my Account.

(2) If I make a payment using a Check, my principal balance will not decrease. The principal balance will increase by the amount of the Check.

(3) Interest will accrue on the total increased principal balance when I use a Check to make a payment on my Account.

(4) I may not use a Check to make a payment once the Draw Period ends; that is, a Check may not be used to make a payment during the Repayment Period.

E. Unless you terminate my Account and require immediate payment of the entire outstanding balance as provided in paragraph 12.B below, I must pay you at least the "Minimum Payment Due" for each billing cycle by the "Payment Due Date" shown on my periodic statement.

F. During the Draw Period, my "Minimum Payment Due" equals all unpaid finance charges, credit life insurance premiums and other charges imposed during the billing cycle together with any "Amount Past Due." My "Minimum Payment Due" during the Draw Period will not reduce the principal balance that is outstanding on my Account.

G. During the Repayment Period, if the Draw Period on my Account is 60 months or 120 months, my "Minimum Payment Due" equals 1/180th of the outstanding principal balance of my Account as of the last day of the Draw Period plus all unpaid finance charges, credit life insurance premiums and other charges imposed during the billing cycle together with any "Amount Past Due."

4. CREDIT LIMIT. My Credit Limit under this Agreement is $ 37,000.00         . I promise not to request a loan which will cause the unpaid principal balance of my Account to exceed my Credit Limit. You can increase the Credit Limit at any time without prior notice to me. You can refuse to make loans that cause my obligations under this Agreement to exceed my Credit Limit. You will make loans on my Account based on the "Available Credit Limit" shown on my most recent periodic statement. However, I agree that if I make payments on my Account by check or other non-cash method, you reserve the right to make loans based on the "Available Credit Limit" shown on the last periodic statement issued prior to the most recent periodic statement. In addition to each "Minimum Payment Due," I must pay immediately, without notice or demand from you, any part of the principal balance of my Account that exceeds my Credit Limit. I promise not to request a reduction in my Credit Limit to an amount below $5,000.

5. ANNUAL PERCENTAGE RATE.

☐ A. The initial Daily Periodic Rate is      N/A %. The initial ANNUAL PERCENTAGE RATE is N/A %. These rates are "discounted" rates. This means that these rates are lower than the rates that would be in effect if the formula set forth in paragraph 5.C below had been used, in which event the initial Daily Periodic Rate would be      N/A % and the initial ANNUAL PERCENTAGE RATE would be      N/A %. These discounted rates will be in effect from the date of this Agreement until N/A          . Thereafter, the Daily Periodic Rate and the Annual Percentage Rate will be determined using the formula set forth in paragraph 5.C below.

☒ B. The initial Daily Periodic Rate is  0.02500 % and the initial ANNUAL PERCENTAGE RATE is 9.125 %. These rates are not discounted.

C. My Annual Percentage Rate and Daily Periodic Rate may increase or decrease (beginning with the first day of the first billing cycle after my "discounted" rate has expired, if applicable) according to the following procedure: The ANNUAL PERCENTAGE RATE shall be the "Index" plus a "Margin." The "Index" will be the highest Prime Rate as published in the "Money Rates" table of The Wall Street Journal as of the first business day of the calendar month. The "Margin" is equal to the number of percentage points disclosed in paragraph 5.D below. Each billing cycle will end on the last day of the calendar month. Any new index value shall be effective as of the first day of the billing cycle in which such new index value is established.

Upon a change in the index, any resulting change in my Daily Periodic Rate and Annual Percentage Rate will take effect without prior notice to me, and will apply to new loans and to the outstanding principal balance in my Account. The new Annual Percentage Rate and Daily Periodic Rate will apply to my then existing unpaid principal balance and all new loans I obtain until my Annual Percentage Rate and Daily Periodic Rate change again. The Daily Periodic Rate at any time equals the ANNUAL PERCENTAGE RATE divided by 365.

D. The "Margin" to be used under paragraph 5.C above to determine my ANNUAL PERCENTAGE RATE is 2.875 percentage points.

LOAN #: 110456793

E. The Annual Percentage Rate is a simple interest rate. The Annual Percentage Rate includes only interest and not other costs. The ANNUAL PERCENTAGE RATE will never increase above **18.000 %** or the maximum rate permitted by law, whichever is less.

F. If the Daily Periodic Rate (and the corresponding Annual Percentage Rate) increase, I will have to pay additional periodic finance charges and, as a result, I will have to pay larger "Minimum Payments."

**6. FINANCE CHARGE.** I agree to pay a finance charge on my Account as explained below.

A. Periodic FINANCE CHARGE.

(1) A loan represented by an Equity Credit Line Check will be posted to my Account on the date that such a check is presented to you for payment. The periodic finance charge begins to accrue on my Account from the time a loan is posted to my Account. You compute the periodic finance charge on my Account by applying the Daily Periodic Rate to the "Average Daily Balance" in my Account (including current transactions). To determine the periodic finance charge for any billing cycle, the "Average Daily Balance" is multiplied by the Daily Periodic Rate, then this product is multiplied by the number of days in the billing cycle.

(2) To get the "Average Daily Balance," you take the beginning principal balance of my Account each day, add any new loans and subtract any principal payments or credits. This gives you the Daily Balance. Then you add up all the Daily Balances for the billing cycle and divide by the total number of days in the billing cycle. This gives you the "Average Daily Balance."

B. Other FINANCE CHARGES.

(1) Points FINANCE CHARGE.

I agree to pay a Points FINANCE CHARGE of $ 0.00                    at the time I sign this Agreement.

$ _____
$ _____
$ _____
$ _____
$ _____

(2) Broker Fee FINANCE CHARGES.

I agree to pay Broker Fee FINANCE CHARGES of $ N/A                    at the time I sign this Agreement.

$ _____
$ _____
$ _____
$ _____
$ _____

(3) Settlement Agent FINANCE CHARGES.

I agree to pay the following Settlement Agent FINANCE CHARGES at the time I sign this Agreement:

| | |
|---|---|
| Closing Fee | $ 0.00 |
| Electronic Doc Fee | $ 35.00 |
| Closing/Escrow | $ 75.00 |
| RECORDING FEE | $ 46.50 |
| | $ _____ |

(4) Miscellaneous FINANCE CHARGES.

I agree to pay the following miscellaneous Finance Charges at the time I sign this Agreement:

$ _____
$ _____
$ _____
$ _____

(5) Annual Maintenance Fee FINANCE CHARGE

☐  I agree to pay an annual maintenance fee FINANCE CHARGE of $              which    you    will charge to my Account on the first anniversary of this Agreement and every anniversary date thereafter, whether or not I have used or continue to use my Account; except that such fee shall be waived for the entire term of this Agreement if I meet both of the following conditions: (a) I maintain an average outstanding daily balance which

❖ HELOC - IL Agreement & Disclosure                    Page 6 of 9                    Initials: 6 · P
2C399-IL (3/04)

LOAN #: 110486793

does not fall below $ _____ from the date of this Agreement through the first anniversary of this Agreement; and (b) I make each monthly payment during that period on or before the due date for each such payment. You will not rebate any portion of the annual fee if my Account is terminated or suspended before the end of any annual period.

[X] I will not be charged an annual maintenance fee FINANCE CHARGE on this loan.

(6) Low Balance Fee FINANCE CHARGE

[ ] In consideration of having an Account with a reduced Margin, I agree to maintain an Average Daily Balance of $40,000 in each monthly billing cycle during the first two years of my Account. I further agree to pay a Low Balance Fee FINANCE CHARGE of $40 for each monthly billing cycle during the first two years of my Account in which I fail to maintain an Average Daily Balance of $40,000. You will not charge me for this fee for the month in which you charge me an Account Termination Fee pursuant to the terms of paragraph 7.D.

7. OTHER CHARGES.
    A. I agree to pay each of the charges listed below, which shall constitute additional indebtedness under this Agreement. Any charges assessed will be shown on my periodic statement for the billing cycle in which such charge is assessed:
        (1) If I fail to make my "Minimum Payment Due" within ten (10) days of the "Payment Due Date," I agree to pay a late fee of 5% of the late payment.
        (2) I agree to pay a Return Item Fee of $15 for each check you receive in payment of my Account which is returned unpaid upon second presentment.

B. I agree to pay you or my broker the following closing costs at or before the time I sign this Agreement:

| | |
|---|---|
| CBL Offset Fee | $    -345.50 |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| LESS Amounts Paid by Lender | $    -0.00 |
| Total Paid by Borrower | $    0.00 |

    C. I may elect to pay the closing costs described in paragraph 7.B above and the finance charges described in paragraph 6.B above in cash or by check at or before the time I sign this Agreement or I may elect to finance some or all of such costs and finance charges by allowing you to make a loan under my Account to pay some or all of such costs and finance charges.

    D. [ ] I agree to pay an Account Termination Fee of $ _____ if I pay in full and terminate my Account with you and ask you to satisfy my mortgage lien on or before the _____ anniversary of this Agreement.

        [X] I will not be charged an Account Termination Fee on this loan.

8. REAL PROPERTY SECURITY. To secure the payment of all loans I obtain and the performance of all promises I make in this Agreement, I and all co-owners are giving you a Mortgage (the "Mortgage") covering my dwelling located at
3815 N OSCEOLA AVE, CHICAGO, IL 60634-3309
(the "Real Property"). The Mortgage is security for my current and future obligations under this Agreement. I will continue to be obligated to make payment to you under this Agreement even if the Real Property is damaged or destroyed and whether or not any insurance proceeds are available.

9. SECTION INTENTIONALLY OMITTED.

10. PROPERTY INSURANCE. I agree to obtain and maintain property insurance against loss or damage to the Real Property, in such amounts, against such risks (including, but not limited to, flood damage insurance required by law), and according to such terms as you may require in the Mortgage or otherwise. I may obtain property insurance from any company of my choice that is acceptable to you. If the amount of the premium for property insurance increases at any time during the term of my Account, I agree to pay any such increase(s).

© HELOC - IL Agreement & Disclosure
20350-IL (10/04)                    Page 4 of 9                    Initials 6 P.

LOAN #: 110456793

## 11. YOUR RIGHTS TO TEMPORARILY SUSPEND MY LOANS OR REDUCE MY CREDIT LIMIT.

A. You may take the actions listed in paragraph 11.B below during the period that any of the following events or conditions occur:

(1) the value of the Real Property declines significantly below its appraised value for the purposes of my Account;

(2) you reasonably believe that I will not be able to meet the repayment requirements under my Account due to a material change in my financial circumstances, such as the filing of a bankruptcy petition by or against me;

(3) I am in default of any material obligation of this Agreement, such as my important obligations listed in paragraph 13 below;

(4) government action (such as enactment of a state usury law) prevents you from imposing the Annual Percentage Rate provided for in this Agreement;

(5) government action (such as imposition of a tax lien) impairs the priority of the lien of the Mortgage such that the value of the lien of the Mortgage is less than 120% of my Credit Limit;

(6) the maximum Annual Percentage Rate set forth in paragraph 5.E above is reached.

(7) you release the Mortgage at my request because I have paid all amounts outstanding under my Account.

(8) the creditor is notified by its regulatory agency that continued advances constitute an unsafe and unsound practice.

B. During the period in which a condition described in paragraph 11.A above occurs, you may refuse to make any additional loans or reduce my Credit Limit or do both. You will mail or deliver written notice to me after you suspend my Account or reduce my Credit Limit and this notice will describe the specific reasons for your action. You are obligated to reinstate my credit privileges when the condition(s) which caused the suspension or reduction have been cured or have changed, provided I have notified you in writing, explaining in detail and documenting how the condition(s) have been cured or have changed and no new condition(s) under paragraph 11.A above or 12.A below have occurred.

C. Before reinstating my right to obtain loans, or restoring my Credit Limit, you may conduct such searches, verifications and evaluations (such as credit reports, appraisals and lien searches) as you deem appropriate, and you may require me to reimburse you on demand for any costs you actually incur for obtaining credit reports and appraisals. You may take these steps to verify that (i) the condition(s) that caused your suspension of my loans or reduction of my Credit Limit no longer exist, and (ii) the priority of the lien of the Mortgage is not impaired.

D. If more than one Borrower signs this Agreement and any such Borrower requests that you cease making loans, you may comply with such a request. All Borrowers who have signed this Agreement must join in any request to reinstate the loans for such request to be effective. If all such persons subsequently request reinstatement of the loans, you must honor such a request unless a condition listed in paragraph 11.A above or 12.A below has occurred.

E. If an event or condition described in paragraph 11.A above occurs which is also an event or condition described in paragraph 12.A below, your rights and remedies described under paragraph 12.B below apply and supersede your rights described in this paragraph 11.

## 12. YOUR RIGHTS TO TERMINATE AND ACCELERATE MY ACCOUNT AND TAKE OTHER ACTION.

A. You may take the actions listed in paragraph 12.B below if any of the following events or conditions occur:

(1) I fail to meet the repayment terms of this Agreement, such as my failure to make any Minimum Payment Due to you on or before the Payment Due Date;

(2) I engage at any time in fraud or material misrepresentation in connection with my Account, whether in any application, in this Agreement or in the Mortgage;

(3) I sell or transfer title to the Real Property without first obtaining your written permission;

(4) I fail to maintain insurance on the Real Property as required under this Agreement or the Mortgage;

(5) I act or fail to act and as a result a lien senior to the lien of the Mortgage is filed against the Real Property;

LOAN #: 110456793

(6)   I die and I am not survived by another person obligated as a Borrower under this Agreement;

(7)   All or part of the Real Property is taken through eminent domain, condemnation or similar government taking;

(8)   A prior lienholder on the Real Property begins foreclosure under its security document;

(9)   The Real Property is used for an illegal purpose which could subject the Real Property to seizure;

(10)  I fail to pay taxes on the Real Property; or

(11)  My action or inaction adversely affects the Real Property or your rights in the Real Property. Such action or inaction could include, for example, the following:

(a)   A judgment is filed against me;

(b)   I commit waste or otherwise destructively use or fail to maintain the Real Property;

(c)   I die and I am survived by another person obligated as a Borrower under this Agreement; or

(d)   I move out of the Real Property.

B.   If an event described in paragraph 12.A above occurs, subject to any notice or other limitation of applicable law, you may do any combination of the following things:

(1)   you may terminate any of my rights under my Account;

(2)   you may temporarily or permanently refuse to make any additional loans;

(3)   you may declare all sums owing under this Agreement and any other agreement I have made with you to be immediately due and payable;

(4)   you may foreclose the Mortgage;

(5)   you may reduce my Credit Limit; and

(6)   you may take any other action permitted by this Agreement, by law or in equity.

13.  MY IMPORTANT OBLIGATIONS. I agree that:

A.   I will pay all of my existing and future debts to you under any existing or future agreement with you and I will pay all of my existing and future debts to my other creditors as they become due and will not allow a creditor to obtain a judgment against me.

B.   I will not permit any person or entity to levy upon, attach, garnish or otherwise take any money, account or other property in your possession that belongs to me.

C.   From time to time, if requested, I will supply you with current financial information about me.

D.   I have not made and will not make any misrepresentation in connection with my Account, whether in my application, in this Agreement, or in the Mortgage.

E.   I will not permit a receiver, sequestrator, liquidator, trustee, guardian, conservator or other judicial representative to be appointed for me or any of my property or for the Real Property.

F.   I will not use or allow use of the Real Property for any illegal purpose.

G.   I will not move out of the Real Property.

H.   I will not permit a lien to be filed which takes priority over the Mortgage for future advances made under this Agreement.

I.   I will not break any promise made in this Agreement or in the Mortgage of Trust such as:

(1)   my promise not to exceed my Credit Limit;

LOAN #: 110456793

(2)  my "Important Obligations" listed in the Mortgage; and

(3)  my promise not to request a reduction in my Credit Limit to an amount below $5,000.

**14. COSTS OF COLLECTION.** Subject to any limits of applicable law, I must pay for your reasonable and actual costs of collection, or foreclosure such as your court costs and reasonable attorney's or trustee's fees. Periodic finance charges will continue to accrue at the rates provided in this Agreement before and after I default and before and after you obtain a judgment against me.

**15. MY RIGHTS TO TERMINATE MY RIGHTS TO OBTAIN LOANS.**

A.  <u>Termination by Me.</u> I may terminate my right to obtain loans by sending you a written notice which will become effective upon receipt by you. If more than one person signs this Agreement as Borrower, my right to obtain loans may be terminated by written notice pursuant to the paragraph 15.A signed by any one or more of such persons. I may also suspend my right to obtain loans pursuant to paragraph 11.D above.

B.  <u>Termination by You.</u> My right to future advances under my Account will terminate at the end of the Draw Period or any renewed Draw Period if not sooner upon your exercise of your termination or suspension rights under paragraphs 11.B or 12.B above or my exercise of my suspension or termination rights under paragraphs 11.D or 15.A above.

C.  <u>Effect of Termination.</u> Upon termination or suspension of my Account, whether by you or by me, I must continue to pay the "Minimum Payment Due" on or before my "Payment Due Dates" until all amounts owed to you under this Agreement are paid in full. However, I may be required to repay all my obligations to you immediately if you exercise your rights under paragraph 12.B above. I must return unused Equity Credit Line Checks to you upon termination. I may be required to pay an Account Termination Fee pursuant to paragraph 7.D above.

**16. CHANGES TO AGREEMENT.**

A.  You may change this Agreement to the extent not prohibited by federal or state law, such as the changes listed as follows:

(1)  if the original Index is no longer available, you may change the Index and Margin;

(2)  you may make any change I agree to in writing;

(3)  you may make a change which is unequivocally beneficial to me, such as offering me more minimum payment options, extensions or renewals of my Account, reductions in the rate or fees, and additional means to access loans; and

(4)  you may make insignificant changes, such as changing the address to which payments must be sent, name changes, operational changes involving the billing cycle date, the date the Minimum Payment is due, the day of the month on which Index values are measured to determine my rate, your rounding rules and the balance computation method.

B.  If required by applicable law, you will mail me notice of such a change before the effective date of the change. The change will be effective as to any existing unpaid balance and as to any future transactions under this Agreement.

**17. OTHER PROVISIONS.**

A.  <u>Third Parties.</u> This Agreement obligates me and my estate, heirs and personal representatives. This Agreement benefits you and your successors and assigns. You may add or release parties, or permit the addition or substitution of real property collateral that secures this Agreement, or modify, extend or amend this Agreement without in any way affecting my or any non-borrower co-owner's obligations under this Agreement. My rights under this Agreement belong only to me, I cannot transfer or assign them to anyone else. You may transfer and assign your rights and obligations under this Agreement and the Mortgage at any time without my consent.

B.  <u>Additional Credit Reports and Appraisals.</u> I authorize you to conduct such searches, verifications and evaluations (such as credit reports, appraisals and lien searches) concerning me, the Real Property and the Mortgage as you may deem necessary from time to time. I will cooperate in having the Real Property reappraised.

C.  <u>Tax Deductibility.</u> I know that I should consult a tax adviser regarding the deductibility of interest and charges.

LOAN #: 110456793

**D.** Applicable Law. I agree that this Agreement is to be governed by federal law and, to the extent not preempted by federal law, by the laws of the state where the Real Property is located.

**E.** Application of Payments. You may apply payments and proceeds of the Real Property in such order as you shall deem advisable or as otherwise required by applicable law.

**F.** Failure to Perform. If I violate or fail to perform any term or condition of this Agreement (or the Mortgage), you may (but are under no obligation to) perform on my behalf. All costs you incur will be added to the unpaid principal of my Account and finance charges will be figured at the rates described above. I agree to pay these costs and finance charges on demand. Your performance of any of my obligations will not be a waiver of any of your rights or remedies under this Agreement.

**G.** Waiver of Jury Trial. I waive my right to a jury trial concerning any enforcement dispute arising under this Agreement.

**H.** Complete Understanding of the Parties. There are no oral agreements concerning this Agreement. This Agreement will not be amended or modified orally. If any provision of this Agreement is held to be void or unenforceable, the rest of this Agreement shall remain in effect.

**I.** Waiver of Notice. I waive presentment, demand, protest, notice of default, nonpayment, partial payments and all other notices and formalities in connection with the delivery, acceptance, performance, default or enforcement of this Agreement, except those notices that are required by federal Regulation Z or other applicable federal or state statutes or regulations.

**J.** Meaning of Words. All words in this Agreement will be read to be of such gender and number as the context may require. The section headings in this Agreement are for convenience and do not limit or amend any of the Agreement's provisions. Any list of conditions or events in this Agreement preceded by the phrase "such as" is not intended as a full or comprehensive list, but merely as a set of examples of such conditions or events. Other conditions or events are intended to be included to the fullest extent permitted under federal and state law, even if different from the listed conditions or events.

**K.** Payment Marked "Payment in Full." I agree not to submit any checks to you in payment of my Account marked "Payment in Full" or similar wording unless the amount of the check is equal to the total amount then owing on my Account. If I do submit a check to you marked "Payment in Full" or similar wording for a sum less than the total amount then owing on my Account, you may accept it in partial payment of my Account but will not be bound by the "Payment in Full" or similar notation. Communications concerning a dispute as to amounts owing on my Account, including any checks submitted to you as full satisfaction of my Account, must be sent to Countrywide Bank, a Division of Treasury Bank, N.A.
P.O. Box 5170, Simi Valley, CA 93062-5170

**L.** Enforcement. You can accept any late or partial payment or otherwise waive or delay enforcing your rights under this Agreement and still exercise your rights at a later time.

**M.** Notices. Except for any notice required under applicable law to be given in another manner, (a) any notice to me provided for in this Agreement shall be given by delivering it or by mailing such notice to me by regular first class mail, addressed to me at my last address appearing on your records or at such other address as I may designate by written notice to you as provided in this paragraph 17.M and (b) any notice to you provided for in this Agreement shall be given by mailing such notice to you by certified mail, return receipt requested, at
Countrywide Bank, a Division of Treasury Bank, N.A.
P.O. Box 5170, Simi Valley, CA 93062-5170
or to such other address as you may designate by written notice to me as provided in this paragraph 17.M.

**N.** Riders/Addenda. The covenants and agreements of each of the riders/addenda checked below are incorporated into and supplement and amend the terms of this Agreement.

☐ No Cost Addendum
_____ Addendum
☒ Billing Rights Statement

☐ _____ Rider
☐ _____

LOAN #: 110456793

BY SIGNING BELOW, (1) I AGREE THAT I HAVE READ ALL PAGES OF THIS AGREEMENT INCLUDING ANY RIDERS/ADDENDA, (2) I AGREE AND INTEND TO BE LEGALLY BOUND BY ALL OF ITS TERMS AND CONDITIONS, INCLUDING ANY TERMS AND CONDITIONS LISTED IN ANY RIDERS/ADDENDA, AND (3) I ALSO ACKNOWLEDGE RECEIVING A COMPLETED COPY OF THIS AGREEMENT AND ANY RIDERS/ADDENDA. I ALSO ACKNOWLEDGE THAT I RECEIVED A COPY OF YOUR HOME EQUITY EARLY DISCLOSURE ENTITLED, "IMPORTANT TERMS OF OUR HOME EQUITY LINE OF CREDIT", THE HOME EQUITY BROCHURE ENTITLED, "WHEN YOUR HOME IS ON THE LINE" AND TWO COPIES OF THE HOME EQUITY LINE OF CREDIT NOTICE OF RIGHT TO CANCEL.

Borrower: NORMAN PENN                                    05-15-05
                                                          Date

Borrower: _____        _____
                                                          Date

Borrower: _____        _____
                                                          Date

Borrower: _____        _____
                                                          Date

# EXHIBIT 5

Prepared by: DEBRA DIEKEN

# TRUTH IN LENDING DISCLOSURE STATEMENT
## (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

LENDER: Countrywide Bank, N.A.

                                                [ ] Preliminary   [X] Final

    1199 North Fairfax St. Ste.500
    Alexandria, VA 22314

DATE 02/10/2006

BORROWERS: BERNICE SMITH

LOAN CASE NO.    126000379

Type of Loan   CONV UNINSURED
NCARM MTA 1mo Intro
PO 1yrHPP

ADDRESS      4803 SOUTH FORRESTVILLE
CITY STATE / ZIP CHICAGO, IL 60615
PROPERTY     4803 SOUTH FORRESTVILLE
                 CHICAGO, IL 60615

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. |
| 7.849 % | $ 751,034.66 | $ 393,209.00 | $ 1,144,243.66 |

PAYMENT SCHEDULE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | WHEN PAYMENTS ARE DUE |
|---|---|---|
| 12 | 1,476.63 | MONTHLY BEGINNING 04/01/2006 |
| 12 | 1,587.38 | MONTHLY BEGINNING 04/01/2007 |
| 12 | 1,706.43 | MONTHLY BEGINNING 04/01/2008 |
| 12 | 1,834.41 | MONTHLY BEGINNING 04/01/2009 |
| 10 | 1,971.99 | MONTHLY BEGINNING 04/01/2010 |
| 301 | 3,461.13 | MONTHLY BEGINNING 02/01/2011 |
| 1 | 3,465.43 | LAST PAYMENT DUE 03/01/2036 |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

DEMAND FEATURE: [X] This loan does not have a Demand Feature.     [ ] This loan has a Demand Feature as follows:

VARIABLE RATE FEATURE:
[X] This loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

SECURITY: You are giving a security interest in the property located at:
4803 SOUTH FORRESTVILLE, CHICAGO, IL 60615

ASSUMPTION: Someone buying this property    [ ] cannot assume the remaining balance due under original mortgage terms
[X] may assume, subject to lender's conditions, the remaining balance due under original mortgage terms.

PROPERTY INSURANCE: Hazard insurance, including flood insurance if the property is in a Special Flood Hazard Area, is required as a condition of this loan. You may obtain the insurance coverage from any insurance company acceptable to the lender. Complete details concerning insurance requirements will be provided prior to loan closing.

LATE CHARGES: If your payment is more than 15      days late, you will be charged a late charge of       5.000%
of the overdue payment.

PREPAYMENT: If you pay off your loan early, you

[ ] may   [X] will not      be entitled to a refund of part of the finance charge.
[X] may   [ ] will not      have to pay a penalty.
[ ] (e) may be charged a prepayment penalty if Countrywide Bank makes your loan. However, if Countrywide Home Loans makes the loan, you will not be charged a prepayment penalty.
See your contract documents for any additional information regarding non-payment, default, required repayment in full before scheduled date, and prepayment refunds and penalties. [e means estimate]

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

_____      2/10/06       _____
BORROWER                   DATE       BORROWER                   DATE

# EXHIBIT 6

Prepared by: DEBRA DIEKEN

LOAN #: 126000379

# ADJUSTABLE RATE NOTE
## (MTA - Twelve Month Average Index - Payment Caps)

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THIS NOTE.**

FEBRUARY 10, 2006                    CHICAGO                         ILLINOIS
[Date]                               [City]                          [State]

4803 SOUTH FORRESTVILLE, CHICAGO, IL 60615
[Property Address]

## 1.    BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 399,500.00        (this amount is called "Principal"), plus interest, to the order of Lender. The Principal amount may increase as provided under the terms of this Note but will never exceed       115 percent of the Principal amount I originally borrowed. This is called the "Maximum Limit." Lender is Countrywide Bank, N.A.

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.    INTEREST

### (A)  Interest Rate

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. Up until the first day of the calendar month that immediately precedes the first monthly payment due date set forth in Section 3 of this Note, I will pay interest at a yearly rate of       7.750 %.   Additional days interest collected prior to the first monthly payment due date is sometimes called "Per Diem" interest and is due at the time I close my loan. Thereafter until the first Interest Rate Change Date, defined below in Section 2(B), I will pay interest at a yearly rate of       2.000  %. This rate is sometimes referred to as the "Start Rate" and is used to calculate the initial monthly payment described in Section 3.  The interest rate required by this Section 2 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### (B)  Interest Rate Change Dates

The interest rate I will pay may change on the first          day of APRIL, 2006          , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

### (C)  Index

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (D)  Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding FOUR                       percentage point(s)   4.000 ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest will never be greater than       9.950 %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

LOAN #: 126000379

other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on    MARCH 01, 2036    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at

P.O. Box 660694, Dallas, TX 75266-0694
or at a different place if required by the Note Holder.

**(B)  Amount of My Initial Monthly Payments**

Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $ 1,476.63            , unless adjusted under Section 3(F).

**(C)  Payment Change Dates**

My monthly payment may change as required by Section 3(D) below beginning on the first          day of APRIL, 2007          , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below. If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D)  Calculation of Monthly Payment Changes**

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than    7.500%  of my prior monthly payment. This 7.500%  limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number    1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment.

**(E)  Additions to My Unpaid Principal**

Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3(D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

**(F)  Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed the Maximum Limit equal to ONE HUNDRED FIFTEEN            percent (    115 %) of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my Minimum Payment would cause me to exceed that limit, I will instead pay a new Minimum Payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

**(G)  Required Full Payment**

On the tenth          Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

**(H)  Payment Options**

After the first Interest Rate Change Date, the Note Holder may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." The Payment Options are calculated using the

LOAN #: 126000379

These Payment Options are only applicable if they are greater than the Minimum Payment.

## 4.   NOTICE OF CHANGES

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5.   BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6.   LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7.   BORROWER'S FAILURE TO PAY AS REQUIRED

### (A)  Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any Minimum Payment by the end of fifteen (15) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be      5.000 % of the Minimum Payment. I will pay this late charge promptly but only once on each late payment.

### (B)  Default

If I do not pay the full amount of each Minimum Payment on the date it is due, I will be in default.

### (C)  Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the Minimum Payment by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe. The date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D)  No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E)  Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

## 8.   GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under

LOAN #: 126000379

## 11. SECURED NOTE

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____

B_____ SMITH                                                    - Borrower

_____

                                                                          - Borrower

_____

                                                                          - Borrower

_____

                                                                          - Borrower

# EXHIBIT 7

Prepared by: DEBRA DIEKEN                    **Countrywide Bank, N.A.**

DATE:    02/08/2006
BORROWER: BERNICE SMITH
CASE #:
LOAN #:    126000379
PROPERTY ADDRESS: 4803 SOUTH FORRESTVILLE
CHICAGO, IL 60615

Branch #: 0000115
15778 S. LAGRANGE ROAD
ORLAND PARK, IL 60462
Phone: (708) 403-0495
Or Fax #: (708) 403-2053

### PAYOPTION ADJUSTABLE RATE MORTGAGE LOAN PROGRAM DISCLOSURE
### MONTHLY TREASURY AVERAGE ("MTA") INDEX - PAYMENT CAPS

This disclosure describes the features of an Adjustable Rate Mortgage (ARM) program you are considering. Information about our other ARM programs will be provided upon request.

**HOW YOUR INTEREST RATE AND PAYMENT ARE DETERMINED**

- Your interest rate will be based on an index rate plus a margin. Please ask us for our current interest rate and margin.
- The index is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.
- Your initial interest rate is not based on the index used to make later adjustments. Please ask us for our current interest rates.
- For the first year of your loan, your payment will be based on the initial interest rate, loan amount and loan term. Additional days interest collected prior to the first monthly payment due date (sometimes called "Per Diem Interest") is based on the index plus the Margin, not the initial interest rate.
- After the first year, your payment will be based upon the current loan amount (which may be higher than the original loan amount due to deferred interest), remaining loan term, and payment caps. Your interest rate, payments, and loan amount will be calculated as described below.

**HOW YOUR INTEREST RATE CAN CHANGE**

| | Initial rate change at 1 month | Initial rate change at 3 months |
|---|---|---|
| Your interest rate can change: | - On your first payment date and every month after that. Each of these dates is called an Interest Rate Change Date. | - On your third payment date and every month after that. Each of these dates is called an Interest Rate Change Date. |
| Each time your interest rate changes: | Your new interest rate will equal the sum of the index plus the margin, subject to the following limits:<br>- Your interest rate will be rounded to the nearest 0.125%<br>- Your interest rate will never be greater than 9.95%, or 11.95% if you have lender-paid "tax advantage mortgage insurance". | |

**HOW YOUR PAYMENT CAN CHANGE**

| | |
|---|---|
| Your payment can change: | - After the first 12 payments and every 12 months after that. Each of these dates is called a Payment Change Date.<br>- Every time your payment changes, it can increase or decrease substantially based on changes in the interest rate and the amount of deferred interest accrued (known as negative interest). |
| Your monthly Minimum payment will be calculated as follows: | - The Minimum Payment you must make each month will be the lesser of the Full Payment or the Limited Payment.<br>- Beginning with your 13th payment (which is the first Payment Change Date), and every 12 months after that, we will calculate the Full Payment and the Limited Payment as follows:<br>  - The "Full Payment," - this will be the amount needed to repay the current loan balance in full by the maturity date, in equal installments, at the interest rate in effect during the month preceding that Payment Change Date; and<br>  - The "Limited Payment," or, "Payment Cap," - this will be 7.5% greater than your preceding Minimum Payment.<br>- After the first Interest Rate Change Date, you may have up to 3 additional payment options, as long as they are greater than the Minimum Payment:<br>  - Interest Only - the amount required to pay the interest due on your loan for that month;<br>  - Amortized Payment - the amount required to pay off the loan by the maturity date in equal installments at the interest rate then in effect;<br>  - 15 Year Amortized Payment - the amount required to pay off the loan within 15 years from the first payment date in equal installments at the interest rate then in effect. |







# EXHIBIT 8

OMB Approval No. 2502-0265

| A. Settlement Statement | B. Type of Loan |
|---|---|

# First American Title Insurance Company
## Settlement Statement

| B. Type of Loan |
|---|
| 1-5. Loan Type  Conv. Unins. |
| 6.   File Number  1303202 |
| 7.   Loan Number 126000379 |
| 8.   Mortgage Insurance Case Number  N/A |

**C.   Note:**   This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown, items marked "(POC)" were paid outside this closing; they are shown here for informational purposes and are not included in the totals.

**D.   Name of Borrower:** Bernice Smith
4803 South Forrestville, Chicago, IL 60615

**E.   Name of Seller:** Refinance

**F.   Name of Lender:** Countrywide Bank, A Division of Treasury
15778 S. LaGrange Road
Orland Park, IL 60462-4766

**G.   Property Location:** 4803 South Forrestville, Chicago, IL 60615

**H.   Settlement Agent:** First American Title Insurance Company
Address: 27775 Diehl Road, Warrenville, IL 60555

Place of Settlement Address: 1358 East 47th Street, Chicago, IL, 60653

**I.**
Settlement Date: 02/10/2006

Print Date: 02/10/2006, 1:46 PM

Disbursement Date: 02/15/2006

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| **100. Gross Amount Due From Borrower** | | **400. Gross Amount Due To Seller** | |
| 101. Contract Sales Price | | 401. Contract Sales Price | |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement charges to borrower (line 1400) | 10,820.35 | 403. Total Deposits | |
| 104. Supplemental Summary | 381,026.26 | 404. | |
| 105. | | 405. | |
| **Adjustments for items paid by seller in advance** | | **Adjustments for items paid by seller in advance** | |
| 106. City/town taxes | | 406. City/town taxes | |
| 107. County taxes | | 407. County taxes | |
| 108. Assessments | | 408. Assessments | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 113. | | 413. | |
| 114. | | 414. | |
| 115. | | 415. | |
| **120. Gross Amount Due From Borrower** | **391,846.61** | **420. Gross Amount Due To Seller** | |
| **200. Amounts Paid By Or In Behalf of Borrower** | | **500. Reductions In Amount Due to Seller** | |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 399,500.00 | 502. Settlement charges (line 1400) | |
| 203. Existing loan(s) taken subject | | 503. Existing loan(s) taken subject | |
| 204. | | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| **Adjustments for items unpaid by seller** | | **Adjustments for items unpaid by seller** | |
| 210. City/town taxes | | 510. City/town taxes | |
| 211. County taxes | | 511. County taxes | |
| 212. Assessments | | 512. Assessments | |

| L. Settlement Charges | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|
| 700. Total Sales/Broker's Commission based on price | | | |
| | Division of Commission (line 700) as follows | | |
| 701. | | | |
| 702. | | | |
| 703. Commission paid at Settlement | | | |
| 704. | | | |
| **800. Items Payable in Connection with Loan** | | | |
| 801. Loan Origination Fee | | | |
| 802. Loan Discount 1.1250% - Countrywide Bank, A Division of Treasury | | 4,494.38 | |
| 803. Appraisal Fee | | | |
| 804. Credit Report - Landsafe Credit | | 35.00 | |
| 805. Lender's Inspection Fee | | | |
| 806. Mortgage Insurance Application Premium | | | |
| 807. Assumption Fee | | | |
| 808. Document Preparation Fee - Countrywide Bank, A Division of Treasury | | 235.00 | |
| 809. Tax Service Fee - Countrywide Tax Service | | 68.00 | |
| 810. Flood Check Fee - Landsafe Flood | | 26.00 | |
| 811. Processing Fee - Countrywide Bank, A Division of Treasury | | 335.00 | |
| 812. | | | |
| 813. | | | |
| 814. | | | |
| Supplemental Summary | | | |
| **900. Items Required by Lender to be Paid in Advance** | | | |
| 901. Interest 02/15/06 to 03/01/06 @$84.830000/day - Countrywide Bank, A Division of Treasury | | 1,187.62 | |
| 902. | | | |
| 903. Hazard Insurance Premium for 1 year(s) to American Family Insurance | | 2,527.00 | |
| 904. | | | |
| 905. | | | |
| Supplemental Summary | | | |
| **1000. Reserves Deposited with Lender** | | | |
| 1001. Hazard Insurance 3 mo(s) @$210.58/mo | | 631.74 | |
| 1002. Mortgage Insurance | | | |
| 1003. City Property Taxes | | | |
| 1004. County Property Taxes 3 mo(s) @$224.56/mo | | 673.68 | |
| 1005. Annual assessments | | | |
| 1006. | | | |
| 1007. | | | |
| 1008. Aggregate Accounting Adjustment | | -0.07 | |
| **1100. Title Charges** | | | |
| 1101. Settlement or closing fee - First American Title Insurance Company | | 125.00 | |
| 1102. Abstract or title search | | | |
| 1103. Title examination | | | |
| 1104. Title Insurance Binder | | | |
| 1105. Document Fee | | | |
| 1106. Notary Fee | | | |
| 1107. Attorney Fee | | | |
| (includes above item numbers: ) | | | |
| 1108. Title Insurance – See supplemental page for breakdown of individual fees and payees | | 300.00 | |
| (includes above item numbers: EPL & Loc Note ) | | | |
| 1109. Lender's coverage $399,500.00 Premium: $300.00 | | | |
| 1110. Owner's coverage $0.00 | | | |
| 1111. | | | |
| 1112. | | | |
| 1113. | | | |
| 1114. | | | |
| 1115. | | | |
| 1116. | | | |
| 1117. | | | |
| **1200. Government Recording and Transfer Charges** | | | |
| 1201. *Recording fees: Deed $0.00 Mortgage $76.00 Release $0.00 | | 76.00 | |
| 1202. City/county tax/stamps: | | | |
| 1203. State tax/stamps: | | | |
| 1204. Certificate of Release Recording Fee - First American Title Insurance Company | | 26.00 | |
| 1205. Rental Housing Support Program Act - First American Title Insurance Company | | 20.00 | |
| 1206. | | | |
| **1300. Additional Settlement Charges** | | | |
| 1301. Survey to | | | |
| 1302. Pest Inspection to | | | |
| 1303. Document Processing Fee - First American Title Insurance Company | | 5.00 | |

| Supplemental Page<br>HUD-1 Settlement Statement | File No.<br>1303202 |
|---|---|
| **First American Title Insurance Company**<br>Settlement Statement | Loan No.<br>126000379 |
| | Settlement Date:<br>02/10/2006 |

Borrower Name & Address: Bernice Smith
4803 South Forrestville, Chicago, IL 60615

Seller Name & Address: Refinance

| Section L. Settlement Charges continued | | Paid From<br>Borrower's<br>Funds at<br>Settlement | Paid From<br>Seller's<br>Funds at<br>Settlement |
|---|---|---|---|
| 1108. Supplemental Summary | 300.00 | | |
| a) Loan Policy - First American Title Insurance Company | | 300.00 | |
| 1201. Supplemental Summary | 76.00 | | |
| a) Mortgage - First American Title Insurance Company | | 76.00 | |

| Section J. Summary of Borrower's Transaction continue | | Borrower Charges | Borrower Credits |
|---|---|---|---|
| 100. Gross Amount Due From Borrower | | | |
| 104. Supplemental Summary | 381,026.26 | | |
| a) 1st Installment 2005 Taxes to Cook County Collector Tax Number: 20-10-210-002-0000 | | 1,347.35 | |
| b) Mortgage Payoff - Wilshire Credit Corporation | | 379,678.91 | |
| 200. Amounts Paid By Or In Behalf of Borrower | | | |

The following Section is restated from the Settlement Statement Page 1

| 300. Cash At Settlement From/To Borrower | | 600. Cash At Settlement To/From Seller | |
|---|---|---|---|
| 301. Gross amount due from Borrower (line 120) | 391,846.61 | 601. Gross Amount due to Seller (line 420) | |
| 302. Less amounts paid by/for Borrower (line 220) | 399,500.00 | 601. Less reductions in amounts due to Seller (line 520) | |
| 303. Cash ( From) (X To) Borrower | 7,653.39 | 603. | |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and distributions made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

BUYER(S):

Bernice Smith

First American Title Insurance Company

By