**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SONIA JENKINS, GERMAN PENA and | ) | |
| BERNICE SMITH, | ) | |
| on behalf of themselves and | ) | 08 CV 2935 |
| the classes defined herein, | ) | |
| | ) | Judge Coar |
| Plaintiffs, | ) | |
| | ) | Magistrate Judge Keys |
| | ) | |
| v. | ) | |
| | ) | |
| COUNTRYWIDE HOME LOANS, INC., | ) | |
| d/b/a AMERICA'S WHOLESALE LENDER, | ) | |
| COUNTRY WIDE BANK, N.A., n/k/a, | ) | |
| COUNTRYWIDE BANK, FSB; and | ) | |
| COUNTRYWIDE FINANCIAL CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

<u>**COUNTRYWIDE'S ANSWER AND AFFIRMATIVE DEFENSES TO
PLAINTIFF'S AMENDED COMPLAINT**</u>

NOW COME Defendants Countrywide Home Loans, Inc. d/b/a America's Wholesale Lender, Countrywide Bank, N.A., Countrywide Bank, FSB, and Countrywide Financial Corporation, through undersigned counsel, and for their Answer and Affirmative Defenses to Plaintiff's Amended Complaint ("Complaint"), states as follows:

1.    This is an action brought by plaintiffs against Countrywide Home Loans, Inc., d/b/a America's Wholesale Lender; Countrywide Bank, N.A., n/k/a Countrywide Financial Corporation; and Countrywide Financial Corporation (collectively "Countrywide"), under the Equal Credit Opportunity Act, 15 U.S.C. § 1691, <u>et seq</u>. ("ECOA") and the Fair Housing Act, 42 U.S.C. § 3601 <u>et seq</u>. Plaintiffs seek remedies for the discriminatory effects of Countrywide's home financing policies and practices.

<u>ANSWER</u>:    The Defendants admit that Plaintiffs allege claims under the Equal Credit Opportunity Act and Fair Housing Act.  Defendants further state that the only named defendants that are engaged in mortgage lending activities are Countrywide Home Loans, Inc., d/b/a

America's Wholesale Lender and Countrywide Bank, N.A., n/k/a, Countrywide Bank, FSB (collectively "Countrywide").   Countrywide Financial Corporation ("CFC") is a holding company not engaged in mortgage lending activities and it, therefore, denies all allegations in Plaintiffs' Amended Complaint.   CFC, therefore, will not respond to individual allegations except when necessary.  Countrywide denies the remaining allegations of paragraph 1.

2.      As described below, Countrywide has established a specific, identifiable and uniform credit pricing system, a component of which, referred to herein as the Discretionary Pricing Policy (the "Policy"), authorizes unchecked, subjective surcharge of additional points and fees to an otherwise objective risk-based financing rate. In other words, after a finance rate acceptable to Countrywide is determined by objective criteria (e.g., the individual's credit history, credit score, debt-to-income ratio and loan-to-value ratios), Countrywide's credit pricing policy authorizes additional discretionary finance charges. These subjective, additional finance charges had a discriminatory impact on plaintiffs and the class members, in violation of ECOA and the FHA.

ANSWER:      Countrywide denies the allegations in paragraph 2.

3.      Countrywide has established policies for retail and wholesale access to its loan products that subjected plaintiffs to a significantly higher likelihood of exposure to discretionary points, fees and interest mark-ups. These costs drove up the cost of plaintiffs' mortgage loans.

ANSWER:      Countrywide denies the allegations in paragraph 3.

4.      Plaintiffs seek damages, declaratory and injunctive relief, disgorgement and restitution of monies.

ANSWER:      Countrywide admits that Plaintiffs seek the relief described in paragraph 4, but deny that they are entitled to any such relief.

## ANSWER TO "JURISDICTION AND VENUE"

5.      Plaintiffs invoke the jurisdiction of this Court pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court in a civil action arising under federal law.

ANSWER:     The allegations contained in paragraph 5 contain legal conclusions to which no response is required.  Should a response be deemed required, Countywide states that 28 U.S.C. § 1331 speaks for itself.

      6.      Venue is proper in this Court pursuant to 28 U.S.C. 1391(b) inasmuch as Countrywide regularly conducted and/or conducts business in this District, and all plaintiffs reside in this district.

ANSWER:     The allegations contained in paragraph 6 of the contain legal conclusions to which no response is required.  Should a response be deemed required, Countywide states that 28 U.S.C. § 1391(b) speaks for itself

## ANSWER TO "PARTIES"

      7.      Ms. Jenkins is an African-American homeowner who resides at 8640 S. Kenwood Avenue, Chicago, Illinois, 60619.

ANSWER:     Countrywide lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 7 and, therefore, denies the same.

      8.      Mr. Pena is a Latino homeowner who resides at 3815 N. Osceola Avenue, Chicago, Illinois, 60634.

ANSWER:     Countrywide lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 8 and, therefore, denies, the same.

      9.      Bernice Smith is an African-American homeowner who resides at 4803 S. Forrestville Avenue, Chicago, Illinois, 60615.

ANSWER:     Countrywide lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 9 and, therefore, denies the same.

      10.      Defendant Countrywide Home Loans, Inc., doing business as America's Wholesale Lender ("Countrywide Home Loans"), is a residential mortgage lender with its principal place of business at 4500 Park Granada Blvd., Calabasas, California, 91302.  Countrywide Home Loans does business in an extensive network of branches throughout the U.S., including in Illinois. Its registered agent name and address are Prentice Hall Corporation, 33 North LaSalle Street, Chicago, IL 60602.

ANSWER:     Countrywide admits the allegations contained in paragraph 10.

11.     Defendant Countrywide Bank, N.A., now known as Countrywide Bank, FSB ("Countrywide Bank"), is a federally insured savings bank with headquarters located at 1199 N. Fairfax Street, Suite 500, Alexandria, Virginia, 22313. It is a residential mortgage lender that does business throughout the U.S., including in Illinois. In addition to its bank branches, it originates mortgage loans through Countrywide Home Loans' network of retail branches, other Countrywide subsidiaries, outside mortgage brokers, correspondent lenders and other financial entities.

ANSWER:     Countrywide denies that Countrywide Bank has more than one branch and admits the remaining allegations contained in paragraph 11.

12.     Countrywide Home Loans and Countrywide Bank are subsidiaries of Countrywide Financial Corporation ("Countrywide Financial"), a diversified financial services company. Countrywide Financial has its principal place of business at 4500 Granada Park, Calabasas, CA 91302. It does business throughout the U.S., including in Illinois.

ANSWER:     Countrywide admits the allegations contained in paragraph 12.     Further answering, Countrywide Financial ("CFC") states that it is a holding company and is not in the business of making loans, and so there is no legal or factual basis for CFC to be named as a defendant in this action.

## ANSWER TO "FACTS"

13.     According to a study by the Joint Center for Housing Studies at Harvard University, mortgage lending discrimination today is subtle but pervasive, with minority consumers continuing to have less-than-equal access to loans at the best price and on the best terms that their credit history, income, and other individual financial considerations merit more than three decades after the enactment of national fair lending legislation. William C. Apgar & Allegra Calder, *The Dual Mortgage Market: The Persistence of Discrimination in Mortgage Lending*, Joint Center for Housing Studies of Harvard University, December 2005, *available at* www.jchs.harvard.edu/publications/finance/w05-11.pdf.

ANSWER:     Countrywide states that the study cited in paragraph 13 speaks for itself. Countrywide denies any allegations in this paragraph purportedly made against it.

14.     The passage of civil rights legislation and fair lending laws in the 1960s and 1970s brought an end to the most virulent forms of overt racial discrimination in the housing markets, but throughout the 1980s and 1990s, mortgage lenders found more subtle ways to discriminate, including maintaining offices only in white neighborhoods and engaging in practices such as redlining (refusing to lend on properties in predominantly minority neighborhoods).

ANSWER:     The allegations contained in paragraph 14 are unsupported and conclusory generalizations, to which no response is required.  Should a response be deemed required, Countrywide admits that civil rights legislation was passed in the United States in the 1960s and 1970s, and denies any allegations in this paragraph purportedly made against it.

15.     After such redlining practices were challenged in the 1990s, mortgage lenders changed tactics once again, making loans to minorities, but charging higher interest rates and loan-related fees than they charged to similarly-situated white borrowers. Loan data that mortgage lenders must now compile and disclose under the federal Home Mortgage Disclosure Act ("HMDA") reveals profound loan pricing disparities between minority borrowers and similarly-situated white borrowers.

ANSWER:     The allegations contained in paragraph 15 are unsupported and conclusory generalizations, to which no response is required.  Should a response be deemed required, states that Home Mortgage Disclosure Act ("HMDA) data speaks for itself and denies any allegations in this paragraph purportedly made against it.

16.     HMDA requires mortgage lenders to report information about the home loans they process each year. In 2005, lenders reported information on more than 30 million home loan applications pursuant to HMDA. In 1989, Congress required lenders to begin disclosing information about mortgage borrowers' race and ethnicity. In 2004, concerned with potential racial discrimination in loan pricing and recognizing that racial or other types of discrimination can occur when loan officers and mortgage brokers have latitude in setting interest rates, the Federal Reserve Board began requiring lenders to also report information concerning rates, points, and fees, charged to borrowers on high-cost loans.

ANSWER:     Countrywide states that the HMDA and any actions taken by Congress or the Federal Reserve, as well as any HMDA data, all speak for themselves.  Countrywide denies any allegations in  this paragraph purportedly made against it.

17.     According to the Federal Reserve, both 2004 and 2005 HMDA data revealed that "Blacks and minority borrowers were more likely ... to have received higher-priced loans than non-minority whites.... [which has] increased concern about the fairness of the lending process." Robert B. Avery, Kenneth P. Brevoort & Glenn B. Canner, *Higher-Priced Home Lending and the 2005 HMDA Data*, 2006 Federal Reserve Bulletin, A124, A159 (revised Sept. 18, 2006), *available at* http://www.federalreserve.gov/pubslbulletin/2006/hmda/bull06hmda.pdf.

ANSWER:     Countrywide states that the 2004 and 2005 HMDA data and the article cited in paragraph 17 speak for themselves. Countrywide denies any allegations in this paragraph purportedly made against it.

18.     HMDA data for 2004 reveals profound loan pricing disparities between minority borrowers and non-minority whites even after controlling for borrowers' gender, income, property location, and loan amount. After accounting for those differences in the 2004 HMDA data, minority borrowers were still almost twice as likely to receive a higher-rate home loan as non-minority whites. *Testimony of Keith Ernst before the Subcommittee on Financial Institutions and Consumer Credit*, June 13, 2006 at 3, *available at* http://www.responsiblelending.org/pdfsffestimony-Ernst061306.pdf. In an October 2006 speech, the Vice-Chairman of the Federal Deposit Insurance Corporation, Martin Gruenberg, noted that 2004 HMDA data "clearly indicated" that minority borrowers are more likely to receive high-cost home loans than are non-minority whites. Martin J. Gruenberg, FDICViceChairman, Address to the Conference on Hispanic Immigration to the United States: Banking the Unbanked Initiatives in the U.S. (Oct. 18, 2006) *available at* http://www.fdic.gov/news/news/speeches/archives/2006/chairman/spocI80c.html

ANSWER:     Countrywide states that the 2004 HMDA data and the articles cited in paragraph 18 speak for themselves. Countrywide denies any allegations in this paragraph purportedly made against it.

19.     Likewise, HMDA data for 2005 shows that "for conventional home-purchase loans, the gross mean incidence of higher-priced lending was 54.7 percent for blacks and 17.2 percent for non-minority whites, a difference of 37.5 percentage points." Avery et al., *supra*, at A159. The situation is similar for refinancing, where there is a difference of 28.3 percentage points between blacks and non-minority whites. *Id.* at A124, A159.

ANSWER:     Countrywide states that the 2005 HMDA data and the articles cited in paragraph

19 speak for themselves.  Countrywide denies any allegations in this paragraph purportedly made

against it.

     20.     A growing number of research studies and investigations show that significant racial disparities still exist in lending practices. See, e.g., California Reinvestment Coalition, et al., *Paying More for the American Dream: A Multi-State Analysis of Higher Cost Home Purchase Lending*, (March 2007) *available at* http://www.nedap.org/pressroom/documents/2007_Report-2005_HMDA.pdf, (hereinafter "2007 CRC Report"); Stephen L. Ross, *The Continuing Practice and Impact of Discrimination*, (Revised July 2006) (Univ. of Connecticut, Working Paper 2005-19R), *available at* http://www.econ.uconn.edu/working/2005-19r.pdf.

ANSWER:     Countrywide states that the research studies and articles cited in paragraph 20

speak for themselves.  Countrywide denies any allegations in this paragraph purportedly made

against it.

     21.     Recently, the California Reinvestment Coalition, jointly with several other nonprofit and housing advocacy groups, published another report. The organizations examined the impact of lending by subprime, lenders in 7 metropolitan areas - Boston, Charlotte, Chicago, Cleveland, Los Angeles, New York City and Rochester, NY. California Reinvestment Coalition, et al., *Paying More for the American Dream: The Subprime Shakeout and its Impact on Lower Income and Minority Communities*, (March 2008), *available at* http://www.nedap.org/documentslMultistateHMDAreport-FinaI21.pdf, (hereinafter "2008 CRC Report").

ANSWER:     Countrywide states that the report cited in paragraph 21 speaks for itself.

Countrywide denies any allegations in this paragraph purportedly made against it.

     22.     Among other things, the study showed that subprime lenders are concentrated in minority neighborhoods. Data supporting this finding demonstrated that subprime lenders had 20% of the market share in predominantly minority neighborhoods in the metro areas studied, compared to a 4% market share in predominantly white neighborhoods. See 2008 CRC Report at 5. In addition, over 40% of the loans made by subprime lenders were in neighborhoods where 80% or more of the residents were minorities. *Id*. In stark contrast, less than 10% of subprime lender loans were in areas where less than 10% of the residents were minorities. *Id.*

ANSWER:     Countrywide states that the study cited in paragraph 22 speaks for itself.

Countrywide denies any allegations in this paragraph purportedly made against it.

23.     In metro Chicago, where all three plaintiffs reside, the same study shows that subprime lenders had 20.5% of the home loan market in neighborhoods where more than 80% of the residents were minorities, while subprime lenders had only 5.6% of the market for home loans in neighborhoods where less than 10% of the residents were minorities. 2008 CRC Report at 17.

ANSWER:     Countrywide states that the study cited in paragraph 23 speaks for itself.

Countrywide denies any allegations in this paragraph purportedly made against it.

24.     The Association of Community Organizations for Reform Now (ACORN) released a report in 2005, finding that "[i]n every metropolitan area where at least 50 refinances were made to African-American homeowners, African-Americans were more likely to receive a high-cost loan than White homeowners." ACORN Fair Housing, *The High Cost of Credit: Disparities in High-priced Refinanced Loans to Minority Homeowners in 125 American Cities*, September 27,2005, at 11, *available at* http://www.acorn.org/fileadminiAfforable_Housing/ hmda/High_Cost_of_Credit_Report.doc.

ANSWER:     Countrywide states that the report cited in paragraph 24 speaks for itself.

Countrywide denies any allegations in this paragraph purportedly made against it.

25.     Moreover, and importantly, research studies have suggested that borrowers' credit profiles cannot fully explain why some borrowers, and not others, are saddled with higher cost loans. Researchers have raised "doubts that risk can adequately explain racial differences" in high-cost loans. Calvin Bradford, Center for Community Change, *Risk or Race? Racial Disparities and the Subprime Refinance Market*, (May 2002), *available at* http://www.knowledgeplex.org/kp/report/report/relfiles/ccc_0729Jisk.pdf. In other words, evidence "suggests that weak borrower credit profiles do not fully explain why some borrowers get stuck with higher-cost home loans." 2007 CRC Report, *supra* at 7.

ANSWER:     Countrywide states that the studies and reports cited in paragraph 25 speak for

themselves.  Countrywide denies any allegations in this paragraph purportedly made against it.

26.     Countrywide is one of the largest mortgage-lending companies in the United States. Countrywide recently was examined in a study conducted by the California Reinvestment Coalition, Community Reinvestment Association of North Carolina, Empire Justice Center, Massachusetts Affordable Housing

Alliance, Neighborhood Economic Development Advocacy Project, and the Woodstock Institute in March of 2007 ("2007 Joint Report"). The study discussed higher cost home purchase lending in six metropolitan areas (including Chicago, where plaintiffs reside) during 2005 and found significant disparities made to minority and white borrowers.

ANSWER: Countrywide admits that it is one of the largest mortgage-lending companies in the United States. Countrywide further states that the studies and reports cited in paragraph 26 of the Complaint speak for themselves. Countrywide denies the remaining allegations of this paragraph and denies that any of its actions violated any laws or regulations.

27. The 2007 Joint Report included specific Countrywide data relating to disparities. For example, it showed that on average in the six metropolitan areas, blacks are almost 5 times more likely to receive a high APR Countrywide purchase money loan than whites. *Id.* p. 10. (Table 2). In Chicago specifically, blacks are almost 5.6 times more likely to receive a high APR Countrywide purchase money loan than whites. *Id.*

ANSWER: Countrywide states that the report cited in paragraph 27 speaks for itself. Countrywide denies the remaining allegations of this paragraph and denies that any of its actions violated any laws or regulations.

28. Based on the latest available Home Mortgage Disclosure Act ("HMDA") data, available from the Department of Housing and Urban Development, blacks who borrow from Countrywide are over three times more likely than whites to have received a high-APR loan to purchase a home and over two times more likely to have received a high-APR loan to refinance their home.

ANSWER: Countrywide states that the HMDA data cited in paragraph 28 speaks for itself. Countrywide denies the remaining allegations of this paragraph and denies that any of its actions violated any laws or regulations.

29. In December 2006, Countrywide agreed to settle regulatory allegations in New York State that its practices result in discrimination against minority borrowers. See, Press Release, Office of the New York Attorney General, "Countrywide Agrees To New Measures To Combat Racial And Ethnic Disparities In Mortgage Loan Pricing" (Dec. 5,2006), *available at* http://www.oag.state.ny.us/press/2006/dec/dec05a 06.html.

ANSWER:     Countrywide states that the article cited in paragraph 29 speaks for itself.

Countrywide denies the characterization of New York regulatory allegations cited in this

paragraph.

    30.     Countrywide publicly promotes its home financing expertise by means of
            nationwide advertising campaigns. In its advertisements, Countrywide solicits
            persons to apply for financing with Countrywide either in one of its offices or
            through one of the mortgage brokers who Countrywide has authorized to accept
            applications on its behalf.

ANSWER:     Countrywide admits the allegations contained in the first sentence of paragraph

30.  Countrywide denies the second sentence of this paragraph.

    31.     Countrywide makes home-mortgage loans directly to consumers through its
            various subsidiaries, including but not limited to Countywide Home Loans and
            Countrywide Bank.

ANSWER:     Countrywide admits the allegations contained in paragraph 31.

    32.     Countrywide also makes home-mortgage loans that are arranged by its network of
            mortgage brokers. Brokers make these loans in reliance on Countrywide's credit-
            granting policies and with Countrywide's participation.

ANSWER:     Countrywide denies the allegations contained in paragraph 32.

    33.     Countrywide's policies as to where to place its numerous branches and offices
            and how to market its products show that it was targeting minority borrowers like
            plaintiffs for subprime loans.

ANSWER:     Countrywide denies the allegations contained in paragraph 33.

    34.     Countrywide's loans are priced based on its internal policies, including but not
            limited to policies established by Countywide Financial for all Countrywide
            affiliates.

ANSWER:     Countrywide admits that its loans are priced according a variety of factors,

including, but not limited to internal policies established by various Countrywide-related entities.

Countrywide denies the remaining allegations of this paragraph.

    35.     Countrywide Financial and the other Countywide defendants participated in
            determining the terms of credit available to plaintiffs, including, without

limitation, by targeting plaintiffs for high-cost loans and by making the Discretionary Pricing Policy applicable to their loans.

ANSWER:    Countrywide denies the allegations contained in paragraph 35.

36.    Countrywide's Discretionary Pricing Policy was unrelated to plaintiffs' objective credit characteristics, such as credit history, credit score, debt-to-income ratio and loan-to-value ratios and results in purely subjective charges that affected the rates otherwise available to plaintiffs.

ANSWER:    Countrywide denies the allegations contained in paragraph 36.

37.    Countrywide provided its mortgage brokers with substantial information about its loan programs, rates and credit criteria, as well as its policies for compensation.

ANSWER:    Countrywide admits that it provided information on its loan programs, rates, credit criteria and compensation policies to various brokers, and denies the remaining allegations of this paragraph.

38.    Countrywide's network of mortgage brokers accepted applications, quoted financing rates and terms (within the limitations set by Countrywide), informed credit applicants of Countrywide's financing options and originated finance transactions using Countrywide's forms, all in accordance with Countrywide's policies.

ANSWER:    Countrywide admits that it did business with mortgage brokers who worked on behalf of prospective borrowers to submit loan applications to Countrywide and other lenders, but lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in paragraph 38 and, therefore, denies the same.

39.    Countrywide provided its mortgage brokers with credit applications, loan contracts and other required financing forms, as well as instructions on filling out those documents necessary to complete home mortgage transactions.

ANSWER:    Countrywide admits that it made available to mortgage brokers various materials relevant to mortgage transactions and denies the remaining allegations of this paragraph.

40.    After plaintiffs provided credit information to Countrywide or one of its mortgage brokers (Ms. Jenkins dealt with a mortgage broker), Countrywide computed a

financing rate through objective credit analyses that, in general, discerned the creditworthiness of each plaintiff.

ANSWER:     Countrywide admits that it analyzes the creditworthiness of prospective customers through objective credit analyses based on a variety of factors, including credit information provided by the customer, and denies the phrase "its mortgage brokers" as well as the remaining allegations of this paragraph.

41.     Countrywide's credit analyses considered numerous risk-related variables of creditworthiness, including credit bureau histories, payment amounts, debt ratio, bankruptcies, automobile repossessions, charge-offs, prior foreclosures, payment histories, credit score, debt-to-income ratios, loan-to-value ratios and other risk-related attributes or variables. On information and belief, Countrywide and/or its mortgage broker used these variables to determine a "mortgage score" for each plaintiff.

ANSWER:     Countrywide admits that it relied upon a variety of factors, including the information cited in paragraph 41, to determine prospective customers' creditworthiness, and denies the phrase "its mortgage broker" as well as the remaining allegations of this paragraph.

42.     Based on these objective risk-related variables and the resulting mortgage score, for each plaintiff Countrywide and/or its mortgage brokers derived a risk-based financing rate at which it would provide a home mortgage, often called the "Par Rate." Alternatively, experienced Countrywide employees and/or Countrywide's mortgage broker estimated the risk-related Par Rate by referring to each plaintiffs credit bureau-determined credit score.

ANSWER:     Countrywide admits that it relied on a variety of factors, including the information cited in paragraph 41, to determine prospective customers' creditworthiness.  Countrywide denies the phrase "its mortgage brokers" and "Countrywide's mortgage broker" as well as the remaining allegations of this paragraph.

43.     Although Countrywide's initial analysis applied objective criteria to calculate this risk-related Par Rate, Countrywide also authorized a subjective component in its credit pricing system —the Discretionary Pricing Policy — to impose additional non-risk-related charges. On information and belief, the applicable Par Rates and authorized discretionary charges were communicated by Countrywide to its loan officers and mortgage brokers via regularly published "rate sheets."

ANSWER:     Countrywide denies the existence of a "Discretionary Pricing Policy" either in fact or as defined by plaintiffs.  Countrywide admits that its loan pricing and rate sheet information was communicated to its loan officers and to third-party mortgage brokers, but denies the phrase "its" mortgage brokers.

44.     Each plaintiff paid the discretionary charges as a component of the total finance charge (the "Contract APR"), without knowing that a portion of his or her contract APR was a non-risk-related charge.

ANSWER:     Countrywide states that all finance charges were disclosed to prospective borrowers before the borrower selected the particular loan product.  Countrywide denies the remaining allegations of this paragraph.

45.     Countrywide's loan officers and mortgage brokers had discretion, within the limits set by Countrywide, to impose discretionary mark-ups as additional points in interest - "a rate mark-up", or as points and fees on the loan. When there was a rate mark-up, as there was in connection with each plaintiff's loan, Countrywide received additional income.

ANSWER:     Countrywide denies the allegations of paragraph 45.

46.     On information and belief, Countrywide's loan officers and mortgage brokers received compensation based, in part, on the amount of discretionary charges added to plaintiffs' loans. This compensation scheme served as an incentive for defendants' loan officers and mortgage brokers to mark-up each plaintiff's loan.

ANSWER:     Countrywide denies the phrase "Countrywide's . . . mortgage brokers." Countrywide admits that its loan officers received compensation based on a variety factors, and denies the remaining allegations of this paragraph.

47.     Countrywide's Discretionary Pricing Policy, by design, caused plaintiffs and the Class to pay a different and higher cost of credit than white borrowers with identical or similar credit scores. As a result of using a subjective pricing component that is designed to charge persons with the same credit profiles different amounts of finance charge, the objective qualities of the initial credit analysis used to calculate the Par Rate were undermined, and the potential for race bias became inherent in the transaction.

ANSWER:   Countrywide denies the allegations contained in paragraph 47.

48.   The Discretionary Pricing Policy, although facially neutral (insofar as the Countrywide uses the same or effectively the same policy for all credit applicants), had a disproportionately adverse effect on plaintiffs and the Class compared to similarly situated  whites in that plaintiffs and the Class paid disparately more in discretionary charges (both in frequency and amount) than whites  with similar credit qualifications. Statistical analyses of discretionary charges imposed on minority and white customers of mortgage companies that use credit pricing systems structured like Countrywide's have revealed that minorities, such as plaintiffs, are substantially more likely than similarly situated whites to pay such charges, even after controlling for credit risk.

ANSWER:   Countrywide denies the allegations contained in paragraph 48.

49.   Defendants' application of a Discretionary Pricing Policy and its effects are not unique to plaintiffs, and the discrimination suffered by plaintiffs is not an isolated occurrence.  Rather, the Policy constitutes a long-standing, systemic pattern and practice of Countrywide and other lenders within the subprime mortgage industry - that had an ongoing effect of discrimination against thousands minority homeowners throughout the U.S., like plaintiffs, by way of disparate impact. Countrywide's pattern and practice existed before plaintiffs' loans were originated, continued after plaintiffs' transactions and continues unabated today.

ANSWER:   Countrywide denies the allegations contained in paragraph 49.

50.   The Discretionary Pricing Policy was Countrywide's standard operating procedure throughout the class period defined below, and it has continued to be standard operating procedure down through the present.

ANSWER:   Countrywide denies the allegations contained in paragraph 50.

51.   Countrywide's loan officers, mortgage brokers and others are Countrywide's agents for the purpose of setting credit price, which was always set based on the Countrywide's Policy.

ANSWER:   Countrywide denies the allegations of paragraph 51.

52.   The disparate impact plaintiffs suffered is a direct result of Countrywide's Discretionary Pricing Policy in that the Countrywide designed, disseminated, controlled, implemented and profited from the Discretionary Pricing Policy that created the disparate impact.

ANSWER:   Countrywide denies the allegations contained in paragraph 52.

53.     Countrywide has a non-delegable duty to ensure that its mortgage financing structure and policies do not have a disparate impact on legally protected classes, such as African-Americans and Latinos. Despite having such a non-delegable duty, Countrywide chose to use a commission-driven, subjective pricing policy that it knew or should have known had a significant and pervasive adverse impact on minorities such as plaintiffs.

ANSWER:     The allegations contained in paragraph 53 contains legal conclusions to which no response is required.  Should a response be deemed required, Countrywide admits that it has a duty to ensure that its financing policies do not have a disparate impact as to legally protected classes, but denies that it breached any such duty.

54.     The disparities between the terms of Countrywide's transaction involving plaintiffs and the terms involving' whites borrowers with similar credit qualifications are not isolated instances, cannot be the product of chance and cannot be explained by factors unrelated to race, but, instead, are the direct causal result of the use of the discriminatory Discretionary Pricing Policy.

ANSWER:     Countrywide denies the allegations contained in paragraph 54.

55.     There are no legitimate business reasons justifying Countrywide's use of its discriminatory Discretionary Pricing Policy that could not be achieved by a different policy that has no discriminatory impact or one with greatly reduced discriminatory impact.

ANSWER:     Countrywide denies the allegations contained in paragraph 55.

56.     Ms. Jenkins is black homeowner who resides at 8640 S. Kenwood Avenue, Chicago, Illinois 60619.

ANSWER:     Countrywide lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 56 of the Complaint and, therefore, denies the same.

57.     On or about April 20, 2007, Ms. Jenkins entered into a mortgage loan transaction with Countrywide. The principal amount of the loan was in the amount of $154,00.00 (Loan # 167628984).

ANSWER:     Countrywide admits the allegations contained in paragraph 57.

58.     Barrister Mortgage brokered the loan.

ANSWER:     Countrywide admits the allegations contained in paragraph 58.

59.     The loan was a "2 Yr Hybrid LIBOR" adjustable rate mortgage with an initial introductory period of 2 years. The interest rate during the introductory period was 8.850%, subject to change every 6 months after the introductory period. After factoring the associated costs of the loan, the Annual Percentage Rate was 10.688%.

ANSWER:     Countrywide states that terms of Ms. Jenkins' loan are set forth in documents provided to Ms. Jenkins at or before closing and those documents speak for themselves.

60.     As part of the refinance, Ms. Jenkins paid various Settlement Charges, amounting to $8,870.00. These fees included a $3,750.00 "Broker Origination Fee" to Barrister Mortgage, a $500.00 "Broker Processing Fee" to Barrister Mortgage, a $500.00 "Administration Fee" to Barrister Mortgage, and a $695.00 underwriting fee to Countrywide.

ANSWER:     Countrywide admits the allegations contained in paragraph 60.

61.     In connection with the loan, Countrywide also paid Barrister Mortgage a yield spread premium in the amount of $1,540.00 representing additional commission based on a marked up rate.

ANSWER:     Countrywide admits that it paid Barrister Mortgage a yield spread premium of $1,540.00, but denies the remaining allegations contained in paragraph 61.

62.     True and correct copies of Truth-in-Lending disclosure and HUD-One Settlement Statement provided in connection with Ms. Jenkins' loan are attached hereto and labeled Exhibit 1 and Exhibit 2, respectively.

ANSWER:     Countrywide states that the documents attached as Exhibits 1 and 2 speak for themselves.

63.     On information and belief, unbeknownst to Ms. Jenkins, the contract APR on the mortgage loan was actually a combination of an objective, risk-based calculation and a totally subjective, discretionary component added pursuant to the Countrywide's Discretionary Pricing Policy.

ANSWER:     Countrywide denies the allegations contained in paragraph 63.

64.     Countrywide did not offer Ms. Jenkins its less expensive loan products that were available to borrowers with similar credit characteristics.

ANSWER:    Countrywide lacks knowledge or information about what loan products Ms. Jenkins discussed with Barrister Mortgage, and thus can neither admit nor deny the allegations contained in paragraph 64 of the Complaint.

65.    On information and belief, Ms. Jenkins was subject to Countrywide's Discretionary Pricing Policy.

ANSWER:    Countrywide denies the allegations contained in paragraph 65.

66.    On information and belief, Countrywide charged Ms. Jenkins a disproportionately greater amount in non-risk-related credit charges than it charges similarly situated white persons.

ANSWER:    Countrywide denies the allegations contained in paragraph 66.

67.    German Pena is a Latino or Hispanic homeowner who resides with his family at 3815 N. Osceola Avenue in Chicago, Illinois, 60634.

ANSWER:    Countrywide lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 67 of the Complaint and, therefore, denies the same.

68.    On or about August 15, 2005, Mr. Pena entered into a residential, purchase money mortgage loan transaction with Countrywide Bank, N.A. The principal amount of financing he obtained was in excess of $331,000.

ANSWER:    Countrywide admits the allegations contained in paragraph 68.

69.    Mr. Pena received his loan from Countywide Bank, N.A., through a Countrywide Home Loans branch located on Halsted Street in Chicago.

ANSWER:    Countrywide admits the allegations contained in paragraph 69.

70.    Countrywide gave Mr. Pena an "80/20" product consisting of a conventional loan with an adjustable interest rate and an amount financed of $294,533.13 and a home equity line of credit ("HELOC") in the amount of $37,000 with an adjustable interest rate. The HELOC rate started at 9.125% and could go as high as 18%.

ANSWER:      Countrywide states that the terms of Mr. Pena's loan are set forth in documents

provided to Mr. Pena at or before closing and those documents speak for themselves.

71.      True and correct copies of the TILA Statement for the first loan and of the
         HELOC agreement for the second loan are attached hereto as Exhibits 3 and 4,
         respectively.

ANSWER:      Countrywide states that the documents attached as Exhibits 3 and 4 speak for

themselves.

72.      As part of the transaction, Mr. Pena also paid various Settlement Charges to
         Countrywide, some of which and/or portions of which were discretionary.

ANSWER:      Countrywide denies the allegations of paragraph 72.

73.      On information and belief, unbeknownst to Mr. Pena, the contract APR on the
         mortgage loan was actually a combination of an objective, risk-based calculation
         and a totally subjective, discretionary component added pursuant to the
         Countrywide's Discretionary Pricing Policy.

ANSWER:      Countrywide denies the allegations contained in paragraph 73.

74.      Countrywide did not offer Mr. Pena its less expensive loan products that were
         available to borrowers with similar credit characteristics.

ANSWER:      Countrywide lacks knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations contained in paragraph 74 of the Complaint and, therefore,

denies the same.

75.      On information and belief, Mr. Pena was subject to the Countrywide's
         Discretionary Pricing Policy.

ANSWER:      Countrywide denies the allegations contained in paragraph 75.

76.      On information and belief, Countrywide charged Mr. Pena a disproportionately
         greater amount in non-risk-related credit charges than it charges similarly situated
         white persons.

ANSWER:      Countrywide denies the allegations contained in paragraph 76.

77.      Ms. Smith is an African-American homeowner who resides at 4803 S.
         Forrestville, Chicago, Illinois, 60615.

ANSWER:    Countrywide lacks knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations contained in paragraph 77 of the Complaint and, therefore,

denies the same.

78.    On or about February 10, 2006, Ms. Smith entered into a mortgage transaction
with Ms. Smith. The principal amount of the loan was $399,500.

ANSWER:    Countrywide admits the allegations contained in paragraph 78.

79.    Ms. Smith received her loan from Countrywide Bank, N.A., through a
Countrywide Home Loans' branch in Orland Park, Illinois.

ANSWER:    Countrywide admits the allegations contained in paragraph 79.

80.    The loan was a complex, Pay-Option ARM loan with a one-month, introductory
"teaser" rate of 2.0%. Thereafter, the rate can jump to as high as 9.95% and
adjusts on a monthly basis.

ANSWER:    Countrywide states that the terms of Ms. Smith's loan are set forth in documents

provided to Ms. Smith at or before closing and those documents speak for themselves.

81.    If plaintiff opted to make the lowest monthly payment, that amount would not be
sufficient to cover the accruing interest. After the first year, accrued interest
becomes additional principal. In this manner, the loan would be negatively
amortizing, and the principal balance of the loan could grow to 115% of the
original principal amount of the loan, i.e., a home equity loss of nearly $60,000.

ANSWER:    Countrywide states the terms of Ms. Smith's loan speak for themselves and were

fully disclosed to Ms. Smith prior to her selection of a loan product.  Countrywide denies the

remaining allegations of this paragraph.

82.    The Option ARM was among the most costly products Countrywide could have
given Ms. Smith.

ANSWER:    Countrywide denies the allegations contained in paragraph 82.

83.    As part of the refinance, Countrywide also charged plaintiff $10,820.35 in
Settlement Charges, including a $4,494.38 "loan discount" fee.

ANSWER:    Countrywide admits the allegations contained in paragraph 83.

84.     True and correct copies of plaintiffs Truth-in-Lending disclosure, Note, Option ARM disclosure, and HUD-l Settlement Statement are attached hereto as <u>Exhibits 5, 6, 7 & 8</u>, respectively.

<u>ANSWER</u>:     Countrywide states that the documents attached as Exhibits 5-8 speak for themselves.

85.     On information and belief, unbeknownst to Ms. Smith, the contract APR on the mortgage loan was actually a combination of an objective, risk-based calculation and a totally subjective, discretionary component added pursuant to the Countrywide's Discretionary Pricing Policy.

<u>ANSWER</u>:     Countrywide denies the allegations contained in paragraph 85.

86.     Countrywide did not offer Ms. Smith its less expensive loan products that were available to borrowers with similar credit characteristics.

<u>ANSWER</u>:     Countrywide lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 86 of the Complaint and, therefore, denies the same.

87.     On information and belief, Ms. Smith was subject to the Countrywide's Discretionary Pricing Policy.

<u>ANSWER</u>:     Countrywide denies the allegations contained in paragraph 87.

88.     On information and belief, Countrywide charged Ms. Smith a disproportionately greater amount in non-risk-related credit charges than it charges similarly situated white persons.

<u>ANSWER</u>:     Countrywide denies the allegations contained in paragraph 88.

**ANSWER TO "DISCOVERY/CONTINUING VIOLATION"**

89.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

<u>ANSWER</u>:     Countrywide repeats and re-alleges each answer in paragraphs 1-88 as if fully set forth herein.

90.     While long suspected, mortgage lending discrimination has only recently been disclosed and quantified. It has only been in the last few years that mortgage lenders have been required to submit details of their subprime home loans under

the Home Mortgage Disclosure Act. The groups that have studied predatory lending and the mortgage market have uncovered incredible racial disparities in the types of mortgages offered, some of which are summarized above.

ANSWER:     The allegations contained in paragraph 90 of the Complaint are unsupported and conclusory generalizations, to which no response is required.  Countrywide further states that the HMDA data and the reports generated by groups studying that data speaks for itself. Countrywide denies that any of its actions violated any laws or regulations.

91.     Defendants' pattern and practice of discretionary pricing and its racially discriminatory effects on minority homeowners have only become apparent relatively recently.

ANSWER:     Countrywide denies the allegations contained in paragraph 91.

92.     Defendants' long-standing and continuing pattern and practice of discretionary pricing and racial discrimination constitutes an unbroken, ongoing violation of the Fair Housing Act and the Equal Credit Opportunity Act.

ANSWER:     Countrywide denies the allegations contained in paragraph 92.

93.     The causes of action alleged herein accrued upon discovery of the discriminatory impact of the Defendants' Discretionary Pricing Policy. Plaintiffs and members of the Class did not discover and could not have discovered through the exercise of reasonable diligence the factual bases of those claims. Indeed, the data forming the basis of Plaintiffs' claims only recently was released and analyzed in a comprehensive manner. Moreover, because Defendants' Discretionary Pricing Policy was not disclosed, plaintiffs and the Class were ignorant of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part.

ANSWER:     Countrywide denies the allegations contained in paragraph 93.

94.     Commission-driven, discretionary pricing systems, such as those used in the mortgage industry and structurally similar to the system utilized by the Defendants, have been found to produce significant discriminatory effects. Knowledge concerning the significant and pervasive discriminatory impact of such credit pricing systems has been widely circulated within the financing industry for several years, as a result of numerous actions by the United States Department of Justice and federal regulatory agencies. See, Facts, section A, *supra*. For this reason, the Defendants knew or should have known that their credit pricing system causes minority homeowners to pay more for mortgage

Case 1:08-cv-02935     Document 22     Filed 07/30/2008     Page 22 of 35


financing than the amounts paid by white customers with identical or effectively identical credit scores.

ANSWER:     Countrywide denies the allegations contained in paragraph 94.

95.     Despite the fact that the Defendants knew or should have known of the discriminatory effect of their Discretionary Pricing Policy, none of the loan documents inform the customer that its finance rates ultimately are subjective and not based solely on risk-related characteristics.

ANSWER:     Countrywide denies the allegations contained in paragraph 95.

96.     The Defendants were and are under a continuous non-delegable duty to disclose to the plaintiffs and Class material information regarding their loans. The fact that certain loan terms are subjective and discretionary is information a reasonable borrower would consider important when deciding whether to accept the loan and on what terms. The fact that the subjective and discretionary components result in a disparate impact on minorities is also information a reasonable minority borrower would consider important.

ANSWER:     The allegations contained in paragraph 96 include legal conclusions to which no response is required.  Should a response be deemed required, Countrywide admits that it had a duty to disclose material information regarding customers' loans, but denies that it breached any such duty.

97.     Plaintiffs and the Class members reasonably believed that the terms of their loans would be based on their creditworthiness and that all material information about the credit price was disclosed. They had no reason to suspect otherwise.

ANSWER:     Countrywide lacks knowledge or information about Plaintiffs' and class members' thoughts and beliefs, and thus can neither admit nor deny the allegations contained in paragraph 77 of the Complaint.

98.     The Defendants' financing documents fostered the appearance that the Defendants offer competitive rates that objectively are set. However, the Defendants never disclosed to its credit applicants the fact that: (a) its credit rates are subjective and can vary significantly among persons with identical credit profiles; and (b)'it had authorized and provided a financial incentive to loan officers, mortgage brokers and others to subjectively increase the credit rate above the rate otherwise available to the homeowner.

ANSWER:          Countrywide denies the allegations contained in paragraph 98.

99.      Due to the inherent nature of the Defendants' undisclosed Discretionary Pricing Policy, the Defendants' minority customers had no way of knowing or suspecting: (a) the existence of the Defendants' subjective credit pricing policy; (b) that they were charged additional, subjectively-imposed, credit costs; (c) that they were charged a disproportionately greater amount for their cost of credit than similarly situated white persons, and or (d) that any part of the loan price was negotiable.

ANSWER:          Countrywide denies the allegations contained in paragraph 99.

100.     The Defendants were or should have been aware that the Discretionary Pricing Policy had a disparate impact on minority borrowers. Even in the face of this information, the Defendants continued affirmatively to authorize the use of the Discretionary Pricing Policy without disclosure to its borrowers.

ANSWER:          Countrywide denies the allegations contained in paragraph 100.

101.     The Defendants shared in the profit realized by the use of the Discretionary Pricing Policy.

ANSWER:          Countrywide denies the allegations contained in paragraph 101.

102.     Further, the "teaser rate" structure of many of the loan products offered by the Defendants, such as the Adjustable Rate Mortgage ("ARM") and the negatively amortizing "Option ARM," facilitated the Discretionary Pricing Policy and the pattern and practice of racial discrimination. That is to say, Defendants' ARM products were designed to ensure that the loans would need to be refinanced quickly, long before their maturity date, and generally before two or three years had elapsed, at which point the rates would start adjusting upwards. Refinancing out of these dangerous products required that Plaintiffs expose themselves again and repeatedly to the Defendants' Discretionary Pricing Policy. All three plaintiffs found themselves in this situation.

ANSWER:          Countrywide denies the allegations contained in paragraph 102.

103.     Finally, the aggregate, comparative nature of the disparate impact of Defendants' loan terms on minorities could not have been known to any individual plaintiff until such time as he or she met with legal counsel.

ANSWER:          Countrywide denies the allegations contained in paragraph 103.

104.     Plaintiffs did not become aware of Defendants' Discretionary Pricing Policy or of its disparate effects in their transactions until they met with present legal counsel.

<u>ANSWER</u>:    Countrywide lacks knowledge or information about Plaintiffs' and class members' thoughts and beliefs, and thus can neither admit nor deny the allegations contained in paragraph 104 of the Complaint.

      105.    For these reasons, Defendants are estopped from relying on any statutes of limitation in their defenses of this action.

<u>ANSWER</u>:    The allegations contained in paragraph 105 of the Complaint contain legal conclusions to which no response is required.   Should a response be deemed required, Countrywide denies the allegations contained in this paragraph.

## ANSWER TO "CLASS ALLEGATIONS"

106.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

<u>ANSWER</u>:     Countrywide repeats and re-alleges each answer in paragraphs 1-105 as if fully set forth herein.

107.     Plaintiffs sue on their own behalf and on behalf of a class of persons under Rules 23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

<u>ANSWER</u>:     Countrywide admits that Plaintiffs purport to bring this matter on behalf of a class of persons under the Federal Rules of Civil Procedure, but denies that class certification would be appropriate.

108.     This class action is brought pursuant to the ECOA and the FHA by the individual named plaintiffs on behalf of themselves and all minority consumers (the "Class") who obtained a home mortgage loan from the Defendants in the United States between January 1,2001, and the date judgment is entered in this case (the "Class Period") and who were subject to the Defendants' Discretionary Pricing Policy pursuant to which they paid discretionary points, fees and/or interest mark-ups in connection with their loan.

<u>ANSWER</u>:     Countrywide admits that Plaintiffs purport to bring this matter on behalf of a class of persons pursuant to the ECOA and FHA, but denies that class certification would be appropriate and also denies the remaining allegations of this paragraph.

109.     The phrase "Discretionary Pricing Policy" refers to the Defendants' policy of authorizing its brokers to impose subjective, discretionary charges and interest mark-ups that are included in the finance charge loans they originate. The Defendants' Discretionary Pricing Policy constitutes a pattern and practice of discrimination that existed throughout the Class Period.

<u>ANSWER</u>:     Countrywide denies the allegations contained in paragraph 109.

110.     Plaintiffs do not know the exact size or identities of the proposed Class, since such information is in the exclusive control of the Defendants. Plaintiffs believe that the Class encompasses many thousands or tens of thousands of individuals who are dispersed geographically throughout the United States. Therefore, the proposed class is so numerous that joinder of all members is impracticable.

<u>ANSWER</u>:     Countrywide denies the allegations contained in paragraph 110.

111.    All members of the Class have been subject to and affected by the same Discretionary Pricing Policy. There are questions of law and fact that are common to the Class, and predominate over any questions affecting only individual members of the Class. These questions include, but are not limited to the following:

a       the nature, scope and operations of Defendants' Discretionary Pricing Policy;

b       whether Defendants are creditors under the ECOA because, for example, in the ordinary course of its business they participate in decisions as to whether or not to extend credit to consumers;

c       whether the Defendants' Discretionary Pricing Policy is a facially neutral credit pricing system that has resulted in racial discrimination in violation of ECOA;

d       whether there are statistically significant disparities between the amount of the discretionary charges imposed on minority persons and the amount of the discretionary charges imposed on white persons, where the disparities are unrelated to differences in creditworthiness;

e       whether any legitimate business reason that may exist for Defendants' use of the Discretionary Pricing Policy could be achieved by a credit pricing system that is less discriminatory in its impact;

f       whether the Court can enter declaratory and injunctive relief; and

g       the proper measure of disgorgement or damages.

ANSWER:    Countrywide denies the allegations contained in paragraph 111.

112.    The claims of the individual named plaintiffs are typical of the claims of the Class and do not conflict with the interests of any other members of the Class in that all three plaintiffs and the other members of the Class were subject to the same Discretionary Pricing Policy that has disproportionately affected minority homeowners.

ANSWER:    Countrywide denies the allegations contained in paragraph 112.

113.    The individual named plaintiffs will fairly and adequately represent the interests of the Class. They are committed to the vigorous prosecution of the Class' claims and have retained attorneys who are qualified to pursue this litigation and have experience in class actions and in consumer protection and discrimination actions in particular.

79927.3

<u>ANSWER</u>:     Countrywide denies the allegations contained in paragraph 113.

114.     A class action is superior to other methods for the fast and efficient adjudication of this controversy. A class action regarding the issues in this case does not create any problems of manageability.

<u>ANSWER</u>:     Countrywide denies the allegations contained in paragraph 114.

115.     In the alternative, Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

<u>ANSWER</u>:     Countrywide denies the allegations contained in paragraph 115.

<div align="center">

**ANSWER TO "COUNT I –**
**DISCRIMINATION IN VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT"**

</div>

116.     Plaintiffs repeat and re-allege every allegation above, as if set forth herein in full.

<u>ANSWER</u>:     Countrywide repeats and re-alleges each answer in paragraphs 1-115 as if fully set forth herein.

117.     Each defendant is a creditor as defined in ECOA, and in the ordinary course of its business, participated in the decision of whether or not to extend credit to one or more plaintiffs.

<u>ANSWER</u>:     CFC denies the allegations in paragraph 117.  Countrywide states that the allegations contained in paragraph 117 contain legal conclusions to which no response is required.

118.     Countrywide designed, disseminated, controlled, implemented and profited from the discriminatory policy and practice alleged herein - the Discretionary Pricing Policy - which has had a disparate, economic impact on plaintiffs compared to similarly situated whites.

<u>ANSWER</u>:     Countrywide denies the allegations contained in paragraph 118.

119.     All actions taken by Countrywide's employees and agents were in accordance with the specific authority granted to them by Countrywide and were in furtherance of Countrywide's policies and practices.

ANSWER:    Countrywide admits that it gave specific authority to certain of its employees, lacks knowledge or information sufficient to form a belief of the truth of whether "all actions" by unnamed employees or "agents" conformed to that authority, and denies the remaining allegations of this paragraph.

      120.    As a result of Countrywide's Discretionary Pricing Policy, Countrywide has collected more in finance charges from plaintiffs than from similarly situated white persons, and for reasons unrelated to credit risk.

ANSWER:    Countrywide denies the allegations contained in paragraph 120.

      121.    Countrywide's Discretionary Pricing Policy violates the Equal Credit Opportunity Act.

ANSWER:    Countrywide denies the allegations contained in paragraph 121.

      122.    Plaintiffs are aggrieved persons, as defined in the ECOA, by virtue of having been subject to the Countrywide's discriminatory Discretionary Pricing Policy.

ANSWER:    Countrywide denies the allegations contained in paragraph 122.

### ANSWER TO "COUNT II – DISCRIMINATION IN VIOLATION OF THE FAIR HOUSING ACT"

      123.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

ANSWER:    Countrywide repeats and re-alleges each answer in paragraphs 1-123 as if fully set forth herein.

      124.    Countrywide engaged in a residential real estate-related transaction with each plaintiff.

ANSWER:    Countrywide admits the allegations contained in paragraph 124.

      125.    Countrywide's Discretionary Pricing Policy has resulted in discrimination with respect to each plaintiff.

ANSWER:    Countrywide denies the allegations contained in paragraph 125.

      126.    As a result of the Countrywide's Discretionary Pricing Policy, Countrywide has collected more in finance charges from plaintiffs than from similarly situated white persons, and for reasons unrelated to credit risk.

ANSWER:     Countrywide denies the allegations contained in paragraph 126.

    127.     Countrywide's Discretionary Pricing Policy violates the Fair Housing Act and constitutes actionable discrimination on the basis of race.

ANSWER:     Countrywide denies the allegations contained in paragraph 127.

    128.     Plaintiffs are aggrieved persons, as defined in FHA, by virtue of having been subject to the Countrywide's discriminatory, Discretionary Pricing Policy.

ANSWER:     Countrywide denies the allegations contained in paragraph 128.

    WHEREFORE, plaintiffs respectfully request the following relief from this Court:

    a     Enter a judgment, pursuant to 15 U.S.C. §1691e(c) and/or 42 U.S.C. §3613, declaring the acts and practices of Countrywide complained of herein to be in violation of the ECOA and the FHA;

    b     Grant a permanent or final injunction, pursuant to 15 U.S.C. 1691e(c) and/or 42 U.S.C. §3613(c), enjoining Countrywide, and Countrywide's agents and employees, affiliates and subsidiaries, from continuing to discriminate against plaintiffs and the Class because of their race or ethnicity through further use of the Discretionary Pricing Policy or any other non-risk-related discretionary pricing policy employed by Countrywide;

    c     Order Countrywide, pursuant to 15 U.S.C. §1691e(c) and/or 42 U.S.C. §3613(c), to adopt and enforce a policy that requires appropriate training of Countrywide's employees, brokers and agents to prevent discrimination;

    d     Order disgorgement, pursuant to 15 U.S.C. §1691e(c), of all disproportionate non-risk charges imposed on plaintiffs and the Class members by Countrywide's Discretionary Pricing Policy; and order the equitable distribution of such charges to Ms. Plaintiffs and the Class, together with other relief for unjust enrichment;

    e     Order actual and punitive damages and/or restitution to plaintiffs and the Class, pursuant to 42 U.S.C. § 3613(c);

    f     Award plaintiffs the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees, pursuant to 15 U.S.C. § 1691e(d) and/or 42 U.S.C. § 3613(c); and

g        Grant plaintiffs and the Class such other and further relief as this Court finds necessary and proper.

<u>ANSWER</u>:      As for the unnumbered prayer for relief following paragraph 128, no response is required.  Should a response be deemed required, Countrywide denies that Plaintiffs are entitled to any of the requested relief.

## <u>SEPARATE AND AFFIRMATIVE DEFENSES</u>

### <u>FIRST DEFENSE</u>

The amended complaint fails to state a claim.

### <u>SECOND DEFENSE</u>

Plaintiffs' claims are barred in whole or in part by the doctrines of laches, waiver, estoppel, and applicable statute of limitations.

### <u>THIRD DEFENSE</u>

Plaintiffs' claims are barred in their entirety because disparate impact claims are not cognizable under the FHA or ECOA.

### <u>FOURTH DEFENSE</u>

Plaintiffs are not entitled to declaratory or injunctive relief because, among other reasons, they have an adequate remedy at law and such relief is barred in whole or in part by the doctrine of unclean hands.

### <u>FIFTH DEFENSE</u>

The imposition of punitive damages on the Defendants would be a violation of the process under the United States Constitution.

### <u>SIXTH DEFENSE</u>

Defendants specifically reserve all separate or additional defenses that they may have against the putative class.  It is not necessary at this time for Defendants to delineate such

defenses against the putative class because no class has been certified and the putative class members are not parties to the litigation.

## SEVENTH AFFIRMATIVE DEFENSE

Some or all Plaintiffs' claims are barred, in whole or in part, because Plaintiffs acquiesced in or consented to the acts and omissions alleged in the Complaint, or benefited from the acts or omissions, and accepted any and all loan terms and conditions disclosed to Plaintiffs.

## EIGHTH AFFIRMATIVE DEFENSE

Some or all of Plaintiffs' claims are barred, in whole or in part, because Defendants have not engaged in any discriminatory practices as alleged in the Complaint.

## NINTH AFFIRMATIVE DEFENSE

Some or all of Plaintiffs' claims are barred, in whole or in part, because Defendants' loan policies and procedures do not have a disparate impact on minority borrowers.

## TENTH AFFIRMATIVE DEFENSE

Some or all of Plaintiffs' claims are barred, in whole or in part, because Defendants have committed no act or omission causing damage to Plaintiffs.

## ELEVENTH DEFENSE

The damages claimed by Plaintiffs are too speculative to support any cognizable claim for relief.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiffs have failed, refused, and/or neglected to take reasonable steps to mitigate their damages, if any, thus barring or diminishing any recovery.

### THIRTEENTH AFFIRMATIVE DEFENSE

Some or all of Plaintiffs' claims are barred, in whole or in part, to the extent that they are based on, and/or the damages alleged in the Complaint were caused by, the acts or omissions of third parties not under the control of Defendants.

### FOURTEENTH AFFIRMATIVE DEFENSE

This case is not appropriate for certification as a class action, and all class allegations and class claims should be struck or dismissed.

### FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiffs have failed to join necessary and/or indispensable parties.

### SIXTEENTH AFFIRMATIVE DEFENSE

Any alleged acts or omissions of Defendants that gave rise to Plaintiffs' claims were and are justified by a legitimate business necessity or other legitimate non-discriminatory reason.

### SEVENTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred or limited, in whole or in part, for a lack of damages and/or injury in fact.

### EIGHTEENTH AFFIRMATIVE DEFENSE

The claims against Countrywide Financial Corporation fail because it is not now, and has never been, a mortgage lender and therefore cannot be held liable under any of Plaintiffs' theories of recovery.

## NINETEENTH AFFIRMATIVE DEFENSE

Countrywide Financial Corporation is not a "creditor" under the Equal Credit Opportunity Act (ECOA), 15 U.S.C. §§ 1691-1691f.

## TWENTIETH AFFIRMATIVE DEFENSE

Some or all of Plaintiffs' claims are barred or limited by the several defenses available under the Fair Housing Act, 42 U.S.C. § 3601 et seq., the Equal Credit Opportunity Act, 15 U.S.C. § 1691 et seq., and the Civil Rights Acts, 42 U.S.C. §§ 1981, 1982, and by additional defenses available under the implementing regulations of the statutes, and Defendants hereby reserve their rights to assert any such defenses.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

Defendants reserve the right to assert these defenses and affirmative defenses and any additional or different defenses and affirmative defenses as to the claims of any persons who are made a member of a class if this Court certifies a class in this case, including but not limited to defenses based on the statute of limitations, laches, bankruptcy, arbitration, res judicata, collateral estoppel, release, settlement, or other defenses and affirmative defenses.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred or limited, in whole or in part, due to license and permission and by the principle that Defendants' conduct cannot be the basis for liability because it was lawful in all respects.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred to the extent that any of them have filed a bankruptcy petition and no longer own their claims.

WHEREFORE, Defendants Countrywide Home Loans, Inc. d/b/a America's Wholesale Lender, Countrywide Bank, N.A., Countrywide Bank, FSB, and Countrywide Financial Corporation respectfully request that this Court enter judgment in favor of Defendants, award Defendants their costs, expenses, attorneys' fees, and grant them such further relief this Court deems just and proper.

Dated: July 30, 2008                             Respectfully submitted,


                                                  _/s/ Steven R. Smith_____
                                                  Steven R. Smith, #3128231
                                                  Derek S. Holland, #6285564
                                                  BRYAN CAVE LLP
                                                  161 North Clark Street, Suite 4300
                                                  Chicago, Illinois 60601
                                                  Telephone: (312) 602-5000
                                                  Facsimile: (312) 602-5050

                                                  *Attorneys for Countrywide Home Loans, Inc., d/b/a America's Wholesale Lender, Countrywide Bank, N.A., n/k/a/ Countrywide Bank, FSB, and Countrywide Financial Corporation*

Of Counsel:

Thomas M. Hefferon
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, D.C.  20001
(202) 346-4000 (telephone)
(202) 346-4444 (facsimile)

James W. McGarry
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
(617) 570-1000 (telephone)
(617) 523-1231 (facsimile)

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that a true and correct copy of the foregoing document was served upon the following counsel of record on July 30, 2008, through the court's electronic filing system as follows:

Al Hofeld     al@alhofeldlaw.com

_____/s/ Derek S. Holland_____
            Derek S. Holland